Cayetano Lasso, Luis Lasso De la Vega López y Nancy Lasso De la Vega López, demandantes y recurridos, *v.* Iglesia Pentecostal la Nueva Jerusalem y otros, demandados; Estado Libre Asociado de Puerto Rico, interventor y recurrente.

Números: RE-88-54      *Resueltos:* 28 de junio de 1991
          CE-87-829

*Rafael Ortiz Carrión, Procurador General, Norma Cotti Cruz, Subprocuradora General,* y *María Adaljisa Dávila, Procuradora General Auxiliar,* abogados del Estado Libre Asociado de Puerto Rico, recurrente; *Rafael Rivera Rosa* y *Pedro Vellón Reyes,* abogados de los demandados; *Raúl Tirado, Hijo,* abogado de los recurridos.

## SENTENCIA

### I

Examinados los señalamientos de error y alegatos de las partes, incluso del interventor recurrente Estado Libre Asociado de Puerto Rico, se modifica la sentencia del Tribunal Superior, Sala de Caguas, para reducir las cuantías concedidas a los demandantes recurridos por concepto de angustias mentales a la suma total de veinticinco mil dólares ($25,000).[1]

---

[1] Por las razones expresadas en sus respectivas opiniones, el Juez Presidente Señor Pons Núñez y los Jueces Asociados Señor Negrón García, Señora Naveira de

## II

De un análisis de la prueba vertida concluimos que procede la revocación de la indemnización de quince mil dólares ($15,000) por violación al derecho de propiedad.[2]

## III

Se revoca el decreto de inconstitucionalidad de la legislación penal incluida en la Ley Núm. 21 de 29 de abril de 1974 (33 L.P.R.A. sec. 1447) y en la Sec. 1 de la Ley Núm. 71 de 26 de abril de 1940 (33 L.P.R.A. sec. 1443).[3]

## IV

Vista la Sec. 4 del Art. V de la Constitución del Estado Libre Asociado de Puerto Rico, preceptivo de que "[n]inguna ley se declarará inconstitucional a no ser por una mayoría del número total de los jueces de que esté compuesto el tribunal de acuerdo con esta Constitución o con la ley", L.P.R.A., Tomo 1, ed. 1982, pág. 356, por no cumplir con ese requisito mayoritario, *se revoca el decreto de inconstitucionalidad de la Ley Núm. 22 de 29 de abril de 1974, que excluye a las instituciones religiosas de la acción interdictal por perturbación o estorbo público.*[4]

Así lo pronunció y manda el Tribunal y certifica el señor Secretario General Interino. Los Jueces Asociados Señor Negrón García, Señora Naveira de Rodón y Señor Alonso

Rodón, Señor Hernández Denton, Señor Alonso Alonso y Señor Andréu García están conformes con la Parte I. El Juez Asociado Señor Rebollo López disiente.

[2] Todos los integrantes del Tribunal están conformes con esta Parte.

[3] Todos los integrantes del Tribunal están conformes con esta Parte.

[4] Los Jueces Asociados Señor Negrón García, Señor Rebollo López, Señora Naveira de Rodón y Señor Alonso Alonso están conformes con la Parte IV. El Juez Presidente Señor Pons Núñez y los Jueces Asociados Señor Hernández Denton y Señor Andréu García disintieron.

Alonso emitieron sendas opiniones concurrentes y de conformidad. El Juez Asociado Señor Rebollo López emitió una opinión concurrente y disidente. El Juez Asociado Señor Hernández Denton emitió una opinión concurrente y disidente, a la cual se unen el Juez Presidente Señor Pons Núñez y el Juez Asociado Señor Andréu García.

(*Fdo.*) Heriberto Pérez Ruiz
*Secretario General Interino*

— O —

Opinión concurrente del Juez Asociado Señor Negrón García.

## I

El "juez es un hombre viviente, y juzga con toda su alma; realiza obra no tan sólo racional, sino humana. La jurisprudencia, en sus aspectos multiformes, es a la vez una ciencia normativa y un arte práctico, que sirve para resolver las dificultades más diversas de la vida social. El arte de juzgar apela al espíritu de sutileza aliado con el espíritu geométrico, incluso en la aplicación de los principios del derecho". F. Gorphe, *Las Resoluciones Judiciales* (L. Alcalá-Zamora y Castillo, trad.), Buenos Aires, Eds. Jurídicas Europa-América, 1953, pág. 38.

Con vista a esta psico-génesis decisoria reiteramos que, en buena metodología adjudicativa, *no* procede el decreto de inconstitucionalidad de las disposiciones estatutarias y reglamentarias aquí impugnadas, a saber: Art. 277 del Código de Enjuiciamiento Civil, Ley Núm. 22 de 29 de abril de 1974 (32 L.P.R.A. sec. 2761); Leyes Núm. 21 de 29 de abril de 1974 y Núm. 71 de 26 de abril de 1940 del Código Penal, 33 L.P.R.A. secs. 1447 y 1443, respectivamente, y el Art. 4.6 del Reglamento de la Junta de Calidad Ambiental

para el Control de la Contaminación por Ruidos, versión enmendada, de 25 de febrero de 1987.

Dos (2) razones impelen ese curso de acción. *Primero*, las propias partes *estipularon* que el *injunction* decretado por el tribunal de instancia *se había tornado académico*. Y *segundo*, en su sentencia dicho foro acogió favorablemente el reclamo de los demandantes Lasso *et al.*; atendió adecuadamente sus planteamientos, y proveyó remedios, más que satisfactorios. Impuso cincuenta mil dólares ($50,000) por "angustias mentales" y quince mil dólares ($15,000) "por violación al derecho a la intimidad y propiedad...". Sentencia, pág. 12. Ahora mediante sentencia mayoritaria, aunque modificamos, estamos confirmando la indemnización.

*DECLARAR INCONSTITUCIONAL UN ESTATUTO ES LA SOLUCIÓN JUDICIAL MÁS EXTREMA EN NUESTRO SISTEMA DE GOBIERNO DE FRENOS Y CONTRAPESOS*. Véanse: *Milán Rodríguez v. Muñoz*, 110 D.P.R. 610, 618–619 (1981); *Negrón Soto v. Gobernador*, 110 D.P.R. 664, 678–679 (1981); *E.L.A. v. Aguayo*, 80 D.P.R. 552, 596 (1958). En esta área, los tribunales debemos optar por la norma prudencial de autorrestricción cuando un caso puede resolverse en armonía con los criterios del actor y en consonancia con los mayores fines de la justicia. *Aponte v. Srio. de Hacienda, E.L.A.*, 125 D.P.R. 610 (1990), opinión concurrente; *Molina v. C.R.U.V.*, 114 D.P.R. 295, 297 (1983); *Mari Bras v. Alcaide*, 100 D.P.R. 506, 513 (1972); *Pueblo ex rel. M.G.G.*, 99 D.P.R. 925, 927 (1971). Si un caso puede ser resuelto sin necesidad de entrar a considerar y resolver una cuestión constitucional, debemos abstenernos de hacerlo. *Spanish Am. Tobacco Co. v. Buscaglia*, 71 D.P.R. 991, 993 (1950); *Tesorero v. Tribl. Contribuciones y Kemper*, 71 D.P.R. 298, 303 (1950). No podemos ignorar estas normas de adjudicación y, como resultado, formular innecesariamente unos pronunciamientos más amplios, sin proporción con los hechos —*Esso Standard*

*Oil v. A.P.P.R.*, 95 D.P.R. 772, 783 (1988)— Y PONER EN JAQUE LA LIBERTAD DE CULTO.

## II

No albergamos dudas de que el trasfondo fáctico en este caso revela una situación meritoria de violación a la intimidad personal y familiar, que exigía la concesión de una indemnización para reivindicar los daños causados. Sin embargo, se extralimitó el foro de instancia al pasar juicio innecesariamente y con *carácter de opinión consultiva* sobre la constitucionalidad de las normas impugnadas.

No se cuestiona seriamente su *academicidad*. La *Iglesia Cristiana Pentecostal La Nueva Jerusalem* y el *Estado Libre Asociado*, en sus respectivos escritos de apelación y revisión, *coinciden* en el carácter consultivo de la controversia. Con razón, objetan la legitimación activa de los demandantes Lasso *et al.* para impugnar el estatuto *penal*.

## III

En estas circunstancias, ciertamente la determinación de inconstitucionalidad no podía prevalecer por haberse tornado *académico el "injunction"*.

Aunque hemos reconocido que la doctrina de academicidad no aplica cuando está presente una cuestión recurrente o repetitiva que evade la revisión —*Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715, 725–726 (1980)— en el caso de autos existen fundamentos válidos que impelen invocar tal excepción, a saber: (a) la naturaleza del mecanismo procesal utilizado para impugnar la constitucionalidad de los estatutos y el reglamento, y (b) el remedio concedido a la parte impugnadora.

Nos preocupa sobremanera la postura del Juez Asociado Señor Hernández Denton, en su opinión concurrente y di-

sidente, que fuerza el asunto. Para ello concluye que "el conflicto entre *los sonidos intolerablemente altos de las ceremonias religiosas* y el derecho a la intimidad y tranquilidad de los vecinos es una controversia *recurrente en otras comunidades* [y] *sujeta*[s] *a evadir su adjudicación ...*". (Énfasis suplido.) Opinión concurrente y disidente del Juez Asociado Señor Hernández Denton, pág. 284. Ese aserto es generalizado e infundado. Es totalmente irrazonable apuntalar la adjudicabilidad de la controversia constitucional en la especulación de que en Puerto Rico el culto es un *estorbo per se,* a saber, que de forma regular y constante se practican ceremonias con "sonidos intolerablemente altos" (íd.) que infringen la tranquilidad de los vecinos.

*Nos negamos a aceptar semejante hipótesis.* Es obvio que está resolviendo implícitamente a base, no de que es un asunto recurrente, sino *potencialmente* recurrente; esto es, susceptible de suceder "en otras comunidades". Ello no es suficiente. A fin de cuentas, en la vida casi todo es posible. PERO EN MATERIA CONSTITUCIONAL, *POSIBILIDAD* NO SIEMPRE ES SINÓNIMO DE *RECURRENCIA.* ¿Puede entonces seriamente sostenerse que la cuestión es "recurrente"? Aun bajo ese laxo supuesto, ¿estamos verdaderamente ante una controversia que evade la revisión judicial? Más que estar *adjudicando,* ¿no estaríamos realmente *teorizando?* En el fondo, ¿no estaríamos pasando sobre la *sabiduría* del diseño estatutario y reglamentario?

## IV

No salva la academicidad del recurso el argumento minoritario fundado en la dicotomía de que el Art. 277 del Código de Enjuiciamiento Civil, *supra,* reconoce una causa de acción que remedialmente se bifurca —de manera independiente— en una prohibición o eliminación de un estorbo y resarcimiento por daños. Opinión concurrente y di-

sidente del Juez Asociado Señor Hernández Denton, pág. 266. Veamos.

El historial legislativo *no revela* que se estuviera inmunizando de manera *absoluta* a las iglesias de la imposición de daños por culpa aquiliana fundados en un menoscabo a la intimidad personal y familiar. Por el contrario, el debate tiende a reflejar que el referido Art. 277 fue enmendado para armonizar la creación de un mecanismo administrativo *inicial* que, a través de la Junta de Calidad Ambiental, canalizara las controversias *ambientales auditivas* generadas por la práctica del culto en sus distintas modalidades.

En este sentido, la tesis minoritaria pasa por alto que el foro de instancia, si bien declaró inconstitucional el estatuto, a la vez aplicó, precisamente como fuente legal *supletoria*, el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141. Resolvió que las "actuaciones culposas y negligentes de los demandados han ocasionado un daño real a la familia demandante [y e]l mismo es resarcible bajo el Artículo 1802", Sentencia, pág. 11. Ciertamente, aun cuando se estipuló académico el *injunction*, el remedio en daños era y es susceptible de subsistir en virtud de *esa* fuente legal *distinta*.

Más aún, los apelantes, *La Iglesia Cristiana Pentecostal La Nueva Jerusalem et al.*, cuestionaron ante nos SOLAMENTE la concesión de "daños *especiales*, no probados y en exceso de la cuantía reclamada en la propia demanda ...". Su discusión se LIMITÓ a que las partidas fueron duplicadas y, a la luz de la prueba, irrazonablemente altas. *Perseveran, sin embargo, en que el decreto de inconstitucionalidad es académico.*

## V

Las premisas en que se funda la opinión concurrente y disidente del Juez Asociado Señor Hernández Denton no sólo son erróneas, sino que inciden en unas zonas complejas y peligrosas. Los derechos dimanantes del Art. II, Sec. 3

de nuestra Constitución, L.P.R.A., Tomo 1, constituyen "las demarcaciones fijadas para la convivencia en paz, tolerancia, respeto recíproco y autonomía espiritual en un terreno en donde por muchos siglos han germinado los mayores conflictos y las más vehementes recriminaciones". 4 Diario de Sesiones de la Asamblea Constituyente 2563 (1950).

No podemos olvidar, pues, que en su dimensión más profunda, la cláusula constitucional sobre separación de Iglesia-Estado obliga por *igual a todos* los poderes de gobierno. Un decreto de inconstitucionalidad mayoritario *afecta los derechos de todas las iglesias del país*. Insistir en el mismo —un caso claramente *académico*— como *única* ruta decisoria no sólo es incomprensible, sino también una forma *sofisticada* e *impermisible* de intromisión del Poder Judicial, que debilita ese inconmensurable y sensitivo valor comunitario recogido en nuestra Carta de Derechos.

— O —

Opinión concurrente y de conformidad emitida por la Juez Asociada Señora Naveira De Rodón.

El 24 de octubre de 1986, Cayetano Lasso De la Vega, Luis Lasso De la Vega López y Nancy Lasso De la Vega López presentaron ante el Tribunal Superior, Sala de Caguas, una demanda contra la Iglesia Cristiana Pentecostal La Nueva Jerusalem (en adelante Iglesia), Reinaldo Ríos López, Alfonso Ríos López y Juan Ríos López.[1] Alegaron que Cayetano Lasso De la Vega era dueño de una propiedad sita en el Km. 4.4 de la Carretera 765 del Barrio Borinquen en Caguas, donde los demandantes tenían constituido su hogar. En las cercanías radica la Iglesia, cuyo ministro es el codemandado Reinaldo Ríos López. Los otros dos codemandados, de una forma u otra, dirigen la Iglesia.

---

[1] La demanda contra Juan Ríos López se desestimó.

Continuaron alegando que los codemandados celebraban servicios los martes, miércoles y viernes de 6:00 de la tarde a 10:00 de la noche, y los domingos de 9:00 de la mañana a 1:00 de la tarde. "Durante la celebración del servicio los demandados, en unión a su feligresía, habla[ban] en alta voz, grita[ban] y utiliza[ban] instrumentos musicales a volúmenes exagerados. Además, ha[bían] instalado bocinas en las afueras del edificio que magnifican los ruidos." Apéndice, Anejo V, pág. 27. A los demandantes esta actividad les imposibilitaba la vida en privacidad y menoscababa el valor de su propiedad.

Aseveraron, también, que no tenían remedio rápido y eficaz en ley para proteger su derecho a la privacidad y al disfrute de la propiedad, ante lo cual solicitaron una orden de entredicho provisional e *injunction* preliminar y permanente. Reclamaron, además, cuarenta mil dólares ($40,000) por concepto de sufrimientos y angustias mentales, y quince mil dólares ($15,000) por el valor disminuido de su propiedad.

Los demandantes impugnaron la constitucionalidad de la Ley sobre Perturbación o Estorbo, Art. 277 del Código de Enjuiciamiento Civil, Ley Núm. 22 de 29 de abril de 1974 (32 L.P.R.A. sec. 2761), y del Reglamento para el Control de la Contaminación por Ruidos de la Junta de Calidad Ambiental, vigente en esos momentos, de 25 de febrero de 1987.[2] Dentro de este mismo procedimiento también impugnaron la constitucionalidad de la Sec. 5 de la Ley Núm. 21 de 29 de abril de 1974 (33 L.P.R.A. sec. 1447). El 29 de octubre de 1987 el tribunal dictó una orden de entredicho provisional y señaló vista para el *injunction* preliminar. El 10 de noviembre se celebró la vista y dictó *injunction* preliminar. El Estado intervino para sostener la constitucionalidad de estas disposiciones.

_____

[2] Con posterioridad a la presentación de la demanda, la Junta de Calidad Ambiental aprobó un nuevo reglamento.

Luego de una serie de trámites procesales, el 31 de marzo de 1987 el tribunal dictó sentencia en rebeldía mediante la que concedió el *injunction* permanente solicitado, diez mil dólares ($10,000) por concepto de angustias mentales y diez mil dólares ($10,000) por violación al derecho a la intimidad, además de tres mil dólares ($3,000) en honorarios de abogado. Inconformes con esta decisión, los demandados presentaron una moción de relevo de sentencia al amparo de la Regla 49.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Entre los fundamentos aducidos no figuró la falta de jurisdicción sobre la persona por no haber sido emplazados. Solicitaron que se dejase sin efecto la sentencia, se señalase "fecha para la vista del caso" y se trasladase el mismo al foro administrativo. El 13 de mayo de 1987 el tribunal dejó sin efecto esta sentencia.

Una vez celebrada la vista en los méritos, el tribunal dictó la sentencia, que es objeto de estos recursos, en la cual decretaba la inconstitucionalidad de las disposiciones legales impugnadas y expedía el *injunction* permanente de estorbo público. Ordenó a los demandados "tomar las medidas necesarias para controlar las emisiones de sonido en la iglesia". Sentencia, pág. 11.[3] También, condenó a los demandados a pagar solidariamente la cantidad de cincuenta mil dólares ($50,000) por concepto de daños por angustias mentales[4] y quince mil dólares ($15,000) por violación al derecho a la intimidad y propiedad, más tres mil quinientos dólares ($3,500) en honorarios de abogado.

Con posterioridad a esta sentencia, el señor Lasso De la

---

[3] Entre estas medidas señaló las siguientes:
"1. Colocar paredes acústicas en el templo;
2. Colocar techos acústicos en el [templo];
3. Colocar acondicionador de aire; y
4. Sellar ventanas y cerrar la puerta principal mientras celebran el culto."
Sentencia, pág. 11.

[4] Esta cuantía se divide de la forma siguiente: treinta mil dólares ($30,000) para el codemandante Cayetano Lasso De la Vega, y para los codemandantes, Luis y Nancy Lasso De la Vega López, diez mil dólares ($10,000) a cada uno.

Vega vendió la propiedad. Con relación a un procedimiento de desacato promovido por la parte demandante, las partes estipularon que el *injunction* decretado se había convertido en académico. El tribunal acogió esta posición, mas sin embargo, dejó en efecto el decreto de inconstitucionalidad de las Leyes Núm. 22 y 21, *supra*, y la determinación de daños.

I

En lo que se refiere al *injunction*, además de encontrar probadas las alegaciones básicas de la demanda, el tribunal hizo las determinaciones de hecho siguientes:

2. En 18 de noviembre de 1985, el codemandante Cayetano Lasso presentó una querella ante la Junta de Calidad Ambiental de Puerto Rico. Esta agencia sólo tiene dos (2) inspectores de ruidos para atender alrededor de 3,000 querellas en toda la Isla; y en consecuencia concluir la investigación de una querella toma un promedio de 256 días. La primera visita para inspeccionar si el ruido es excesivo se realiza de acuerdo al área que pertenezca la querella y el plan de inspecciones. Esta primera visita puede tardar meses y mientras se realiza dicha inspección el ruido excesivo puede continuar sin que el ciudadano tenga recurso legal. De igual manera el ruido excesivo de naturaleza religiosos [sic] que se prolongue por una o dos semanas solamente puede quedar fuera del alcance de los dos inspectores de Calidad Ambiental que confesaron, no son suficientes para atender eficazmente todas las querellas que se reciben. Por su parte la Policía de Puerto Rico al ser llamada a intervenir con el ruido exagerado se niega a intervenir por exclusión de la Ley #120 — — de 1974 en cuanto a ruidos religiosos de la categoría criminal como ruidos innecesarios.

Para determinar si se violó el Reglamento Sobre Control de Ruido, el inspector debe realizar tres (3) investigaciones sobre el terreno. En este caso sólo se hizo una que arrojó 62 decibeles. El Director de la División Legal de la Agencia opinó que el Reglamento sobre Control de Ruidos que estaba vigente cuando se hizo la única inspección era inconstitucional, porque permitía que las propias iglesias participaran en la determinación administrativa.

Cabe añadir que el uso de vehículos oficiales rotulados con el sello de la agencia permite que los miembros de las iglesias se percaten de la presencia del inspector y disminuyan los ruidos durante el tiempo que dura la inspección. Y así ocurrió en este caso por lo que la medición no refleja la realidad.

3. La falta de acción de la Junta de Calidad Ambiental, obligó al codemandante Lasso a presentar una querella en ARPE en 10 de enero de 1985, sobre posibles violaciones por parte de la iglesia al Reglamento de Zonificación. ARPE no determinó violación a su Reglamento.

4. La futilidad de los recursos administrativos ante los ruidos insoportables producidos en el templo movió al señor Lasso a someter querellas en la Policía de Puerto Rico. Las disposiciones de ley que eximen los ruidos de cultos religiosos del alcance del Código Penal impidieron que se le diera curso a estas querellas. La propia Policía de Puerto Rico le recomendó a dicho codemandante que colocara bocinas en su hogar y las utilizara cuando la iglesia celebrara culto. El codemandante obedeció la instrucción que le dio la Policía, adquirió bocinas y las utilizó conforme a las instrucciones que recibió de los agentes del orden público para contrarrestar el ruido. Ello denota la desesperación de esta persona ante la intranquilidad de su familia .... Sentencia, págs. 3 y 4.

Así las cosas, el 28 de diciembre de 1987 la parte demandada presentó un escrito de apelación en el que alegaba la comisión de diez (10) errores. Entre éstos plantearon la inconstitucionalidad de las Leyes Núms. 21 y 22, *supra,* y la suficiencia de la prueba respecto a los daños concedidos.([5])

(5) También plantearon que el caso se había convertido en académico y que erró el tribunal de instancia al asumir jurisdicción sobre los demandados que no habían sido emplazados. No les asiste la razón. Con relación a la academicidad estimamos que estamos ante una excepción a dicha doctrina, ya que presentaría una cuestión recurrente y repetitiva, susceptible de evadir la revisión judicial. *Asoc. de Periodistas v. González,* 127 D.P.R. 704 (1991); *El Vocero v. Junta de Planificación,* 121 D.P.R. 115 (1988). En cuanto a la falta de jurisdicción, cualquier falla en el emplazamiento se subsanó con los actos de sumisión voluntaria realizados por los demandados.

Alegaron, además, que erró el foro de instancia al conceder honorarios de abogado. Basta con señalar que la determinación de temeridad que da paso a la imposición de honorarios de abogado y la cuantía a concederse, son discrecionales y, salvo abuso en el ejercicio de esta discreción, no intervendremos con dichas determinaciones. *B.M. v. U.P.R.,* 125 D.P.R. 294 (1990), y casos allí citados; *Fernández v. San Juan Cement Co., Inc.,* 118 D.P.R. 713 (1987); *Raluan Corp. v. Feliciano,* 111 D.P.R. 598 (1981).

El Estado, inconforme también con las declaraciones de inconstitucionalidad, presentó solicitud de revisión limitada a este planteamiento. Alegó la comisión de tres (3) errores:

### PRIMER ERROR

El Honorable Tribunal Superior incurrió en error al resolver que la Ley Núm. 22 del 29 de abril de 1974 Art. 277 del Código de Enjuiciamiento Civil y las secciones 1443 y 1447 del Código Penal son inconstitucionales.

### SEGUNDO ERROR

El Honorable Tribunal incurrió en error al examinar la validez constitucional de la Ley Núm. 22 *supra* a la luz de la cláusula constitucional de separación de Iglesia y Estado, cuando dicha disposición establece que la Junta de Calidad Ambiental tendrá jurisdicción exclusiva en primera instancia para dilucidar todo lo relacionado con el culto público practicado por las diferentes religiones.

### TERCER ERROR

El Honorable Tribunal Superior incurrió en error al examinar la validez constitucional de las secciones 1443 y 1447 del Código Penal a la luz de planteamientos de separación de Iglesia y Estado y debido proceso de ley sustantivo y derecho de intimidad. Más aún en un caso en que el demandante carecía de capacidad jurídica para impugnar la validez constitucional del estatuto penal. Informe del Procurador General, pág. 4.

Decidimos revisar. Consolidamos los recursos y expedimos.

## II

El impugnado Art. 277 del Código de Enjuiciamiento Civil, Ley Núm. 22, *supra*, establece lo siguiente:

*Sec. 2761. Perturbación, definición; acción para obtener su cese.*
Todo lo que fuere perjudicial a la salud, indecente u ofensivo a los sentidos, o que interrumpa el libre uso de la propiedad, de modo que impida el cómodo goce de la vida o de los bienes, *constituye una perturbación que da lugar a una acción. Dicha acción podrá ser promovida por cualquiera persona cuyos bienes hubieren sido perjudicados o cuyo bienestar personal resulte*

*menoscabado por dicha perturbación; y la sentencia podrá ordenar que cese aquélla, así como decretar el resarcimiento de los perjuicios;* lo aquí provisto no podrá aplicarse a las actividades relacionadas con el culto público practicado por las diferentes religiones; Disponiéndose, que nada de lo aquí dispuesto limitará los poderes de la Junta de Calidad Ambiental para promulgar los reglamentos a que está autorizada por ley. (Énfasis suplido.)

Como se puede apreciar, con relación a la Ley Núm. 22, *supra*, estamos frente a la declaración de inconstitucionalidad de una disposición procesal: la Ley sobre Perturbación o Estorbo. Esto hace necesario que, al analizar el problema que confrontamos, la ubiquemos en su justa perspectiva.

La citada Ley sobre Perturbación o Estorbo, cuya constitucionalidad se cuestiona, provee un procedimiento o remedio especial para la emisión de órdenes interdictales que prohíban "[t]odo lo que fuere perjudicial a la salud, indecente u ofensivo a los sentidos, o que interrumpa el libre uso de la propiedad, de modo que impida el cómodo goce de la vida o de los bienes ...". Ley Núm. 22, *supra*. En este tipo de *injunction* especial, como es lógico presuponer, al preestablecerse por ley las circunstancias en que podría dictarse se le facilita al tribunal la ponderación de los criterios que guían el ejercicio de su discreción: la existencia de un remedio adecuado en ley, la irreparabilidad del daño y el balance de intereses. *P. R. Telephone Co. v. Tribunal Superior*, 103 D.P.R. 200, 202 (1975); O.M. Fiss, *Injunctions*, 2da ed., Nueva York, 1984, pág. 73; J.A. Cuevas Segarra, *Práctica Procesal Puertorriqueña: Procedimiento Civil*, San Juan, Pubs. J.T.S., 1979, Cap. IX, pág. 372. La ley también dispone que se podrá conceder daños por los perjuicios recibidos.

El legislador exceptuó de esta disposición procesal, de este remedio especial, "las actividades relacionadas con el culto practicado por las diferentes religiones". Art. 277, *supra*. La salvaguarda de los derechos de los ciudadanos

que pudieran quedar afectados por estas actividades la encausó por la vía administrativa, a través de la Junta de Calidad Ambiental.

Cabe señalar que, en cada proceso, los tribunales de primera instancia concederán "el remedio a que tenga derecho la parte a cuyo favor se dicte, aun cuando ésta no haya solicitado tal remedio en sus alegaciones". Regla 43.6 de Procedimiento Civil, 32 L.P.R.A. Ap. III.

Ahora bien, en el ámbito procesal propiamente, es norma de conocimiento general que las reglas y leyes procesales "no tienen vida propia, sólo existen para viabilizar la consecución del derecho sustantivo de las partes", *Dávila v. Hosp. San Miguel, Inc.*, 117 D.P.R. 807, 816 (1986), y que puede haber varios procedimientos o remedios disponibles para tramitar un mismo asunto ante los tribunales. Los procedimientos o remedios, dependiendo de lo dispuesto en cada estatuto en específico, pueden utilizarse en forma concurrente, alterna o exclusiva.

Con los principios antes enunciados en mente, pasemos a considerar el estado de derecho procesal existente cuando los demandantes presentaron su petición de *injunction*.

En 1974 la Legislatura enmendó la Ley sobre Perturbación o Estorbo, Ley Núm. 22, *supra*, con el propósito de vedar su uso cuando las actividades allí definidas las realizara una institución religiosa como parte de su culto público. Específicamente se dispuso:

> ... [L]o aquí provisto no podrá aplicarse a las actividades relacionadas con el culto público practicado por las diferentes religiones; Disponiéndose que nada de lo aquí dispuesto limitará los poderes de la Junta de Calidad Ambiental para promulgar los reglamentos a que está autorizada por ley.

La Ley sobre Política Pública Ambiental, Ley Núm. 9 de 18 de junio de 1970, según enmendada, en su Art. 11(12), 12 L.P.R.A. sec. 1131(12), por su parte, en lo concerniente a

las facultades concedidas a la Junta de Calidad Ambiental, dispone:

> (12) Establecer normas de calidad y pureza del ambiente, según estimare conveniente y adoptar reglas y reglamentos necesarios y razonables para el control, disminución o eliminación de sonidos nocivos a la salud y al bienestar público. Disponiéndose, que en la adopción de las reglas y reglamentos referentes a los sonidos y a la determinación de cuáles son nocivos a la salud y al bienestar público deberá tomar en cuenta el ejercicio de derechos constitucionales tales como la libertad de culto, la libertad de expresión, la libertad de asociación y el derecho a la privacidad. De esta forma se garantizará el mejor balance de intereses conforme a las tradiciones, valores y patrones culturales del pueblo de Puerto Rico.
>
> *La Junta de Calidad Ambiental tendrá jurisdicción exclusiva en primera instancia para dilucidar todo lo relativo a casos de sonidos relacionados con iglesias, templos, lugares de predicación, misiones y otros lugares dedicados al culto público con exclusión de cualquier otro foro administrativo o judicial. Cualquier pleito que se radique en un tribunal de justicia de carácter civil o criminal que se trate de un caso de sonido generado en las instituciones arriba indicadas será trasladado a la Junta de Calidad Ambiental para su dilucidación y adjudicación, sin menoscabo de usar otro recurso establecido por ley.* (Énfasis suplido.)

Estas leyes, como correctamente señala el Estado, confirieron a un organismo administrativo, la Junta de Calidad Ambiental, jurisdicción primaria sobre toda actividad relacionada con el culto público practicado por las diferentes religiones que pudiera ser "perjudicial a la salud, indecente u ofensiv[a] a los sentidos, o que interrumpa el libre uso de la propiedad, de modo que impida el cómodo goce de la vida o de los bienes ...". Art. 277, *supra*. En otras palabras, el legislador estimó que ante la naturaleza de los derechos fundamentales que entraban en juego —derecho a la intimidad de una parte y la libertad de culto de otra— era más apropiado canalizar la dilucidación de estas controversias a través de una agencia administrativa la cual, con el peritaje necesario pudiera, al dirimir el conflicto,

hacer inicialmente el requerido y delicado balance entre estos derechos.

No cabe duda de que la aprobación de la Ley Núm. 22, *supra*, estuvo matizada de una activa participación por parte de los diferentes sectores religiosos del país y de que el factor precipitante fue la gran concentración convocada por estos movimientos religiosos para protestar de nuestra decisión en *Sucn. de Victoria v. Iglesia Pentecostal*, 102 D.P.R. 20 (1974). Sin embargo, no podemos perder de vista el hecho de que el objetivo que persigue esta pieza legislativa es enteramente legítimo: establecer "un equilibrio saludable entre los intereses de los ciudadanos a disfrutar su intimidad y la necesidad de que haya templos de religión en todos los sectores, accesibles al pueblo, para adorar a Dios [libertad de culto]". P. del S. 784. Este propósito se pretende lograr canalizando estas controversias a través de la Junta de Calidad Ambiental.

A pesar de este laudable objetivo, la prueba claramente demostró que el esquema administrativo establecido por el Estado resultó inefectivo para salvaguardar el derecho a la intimidad y propiedad de los demandantes.

Ni del historial legislativo ni del texto de la disposición estatutaria se desprende que la intención legislativa fuese vedar la utilización de otros remedios, ya sea para la concesión del *injunction* o de los daños, cuando lo que estuviese en controversia fueran actividades relacionadas con el culto público practicado por las diferentes religiones. Ante esta situación, el foro de instancia tenía que auscultar si había algún otro remedio procesal eficaz disponible para vindicar y salvaguardar los derechos de los demandantes, o si inexorablemente tenía que entrar a dilucidar el planteamiento de la inconstitucionalidad de esta ley para poder disponer de la controversia.

Consistentemente hemos resuelto que no abordaremos planteamientos "de índole constitucional cuando se puede disponer del caso en armonía con los intereses [de las

partes] y en consonancia con los mejores fines de la justicia". *Pueblo ex rel. M.G.G.*, 99 D.P.R. 925, 927 (1971). Véanse: *Mari Bras v. Alcaide*, 100 D.P.R. 506, 513 (1972); *Molina v. C.R.U.V.*, 114 D.P.R. 295, 297 (1983); Rotunda, Nowak, Young, *Treatise on Constitutional Law: Substance and Procedure*, Minnesota, West Publishing Co., 1986, Vols. 1 y 3, Secs. 2.13(g) y 23.10. El principio básico de la revisión judicial es que "la constitucionalidad de un acto de gobierno [o una ley] sólo puede juzgarse dentro de los límites de una controversia real entre litigantes opuestos, en la cual sea indispensable dictaminar sobre la validez constitucional del acto [o ley] para resolver el conflicto surgido entre los litigantes". *E.L.A. v. Aguayo*, 80 D.P.R. 552, 601 (1958). Véase R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Inst. Educación Práctica, 1986, Vol. 1, Cap. II, Sec. 8(B) y Cap. IV. En el caso de autos no era indispensable entrar a considerar la constitucionalidad de la Ley Núm. 22, *supra*, para disponer del mismo.

"Repetidamente hemos resuelto que el carácter y primacía del derecho a la intimidad opera *ex proprio vigore* y puede hacerse valer aun entre personas privadas." *Arroyo v. Rattan Specialties, Inc.*, 117 D.P.R. 35, 64 (1986). Véanse: *P.R. Tel. Co. v. Martínez*, 114 D.P.R. 328, 339 (1983); *Colón v. Romero Barceló*, 112 D.P.R. 573, 576 (1982); *Figueroa Ferrer v. E.L.A.*, 107 D.P.R. 250 (1978); *E.L.A. v. Hermandad de Empleados*, 104 D.P.R. 436, 440 (1975); Art. II, Sec. 8, Const. E.L.A., L.P.R.A., Tomo 1. También hemos reconocido el *injunction* clásico como el instrumento procesal más eficaz para vindicar los derechos constitucionales y que "la reivindicación de los derechos constitucionales corresponde y puede reclamarse en primera instancia en los tribunales de justicia sin que tenga jurisdicción original sobre ello el foro administrativo", *García Cabán v. U.P.R.*, 120 D.P.R. 165 (1987); véase *Ortega Cabrera v. Tribunal Superior*, 101 D.P.R. 612 (1973),

cuando se trate de " 'un agravio de patente intensidad al derecho del individuo que reclame urgente reparación'...". *Pierson Muller I v. Feijoó*, 106 D.P.R. 838, 850 (1978); véanse los casos *García Cabán v. U.P.R.*, supra; *Noriega v. Gobernador,* 122 D.P.R. 650 (1988).

Cuando lo establecido mediante ley o reglamento se trunca; cuando la realidad no corresponde al esquema planificado, se justifica preterir el foro administrativo y recurrir al remedio extraordinario del *injunction* clásico. No cabe duda que bajo los hechos que el tribunal encontró probados y el estado de derecho procesal vigente, el *injunction* clásico era el único remedio disponible para poder efectivamente salvaguardar el fundamental derecho de los demandantes a la intimidad, a vivir en paz en su propia casa. A todo esto le tenemos que añadir el hecho de que la propia Ley sobre Política Pública Ambiental, expresamente dispone la posibilidad de un remedio judicial al disponer que cuando se presenta un caso civil de esta naturaleza, el tribunal lo trasladará a la Junta de Calidad Ambiental *"sin menoscabo de usar otro recurso establecido por ley"*. Tampoco cabe duda de que procedía el resarcimiento de daños al amparo del Art. II, Sec. 8 de nuestra Constitución, *supra*, y la jurisprudencia interpretativa de la misma.

Aquí se trataba en esencia "de uno de los valores más preciados de la vida civilizada: la vivienda, que sin ser fastuosa, sea tranquila, serena y agradable; el hogar en el cual el ser humano busca tranquilidad espiritual y física luego de un día gastado en la lucha económica de la sociedad industrial contemporánea". *Torres v. Rodríguez*, 101 D.P.R. 177, 178 (1973). Sobre este cardinal derecho para la pacífica convivencia en una sociedad democrática, en *Sucn. de Victoria v. Iglesia Pentecostal*, supra, págs. 22–23, expresamos:

> El vértigo de la vida moderna deja libres muy pocos momentos para la reflexión sin la cual no habrá un cabal entendi-

miento de las libertades. Unicamente el hogar brinda esos momentos de serenidad en que además de partir el pan con los suyos pueda el hombre encauzar su existencia y la de su familia entre lo conocido y el arcano que nos ofrece la vida. Sin esa oportunidad para la serenidad y la reflexión que van reduciéndose paulatinamente, ha dicho el Juez Frankfurter, la libertad de pensamiento se torna en burla, y sin libertad de pensamiento no puede existir una sociedad libre. No concebimos derecho de posición preferente a la libertad de estar y sentirse tranquilo en su casa. (Escolios omitidos.)

Considerada la naturaleza de los daños que se le estaban ocasionando a los demandantes, procedía su resarcimiento al amparo de la disposición constitucional que garantiza el derecho a la intimidad. Dada su irreparabilidad y la inexistencia de un remedio adecuado en ley, también procedía utilizar el recurso de *injunction* clásico disponible al amparo de la Regla 57 de Procedimiento Civil, 32 L.P.R.A. Ap. III, y los Art. 675 a 677 del Código de Enjuiciamiento Civil, 32 L.P.R.A. secs. 3521 a 3523; *P.R. Telephone Co. v. Tribunal Superior*, supra; *Cobos Liccia v. Dejean Packing Co., Inc.*, 124 D.P.R. 896 (1989); *Universidad del Turabo v. L.A.I.*, 126 D.P.R. 497 (1990), voto particular de conformidad emitido por la Juez Asociada Señora Naveira de Rodón; *Wright and Miller, Federal Practice and Procedure: Civil* Secs. 2941-2946 (1973); D. Rivé Rivera, *Recursos Extraordinarios*, Hato Rey, U.I.A., 1989, Cap. 1. Bajo este dinámico remedio procesal, el tribunal conserva jurisdicción para, de ocurrir cambios en las circunstancias, modificar el dictamen a favor o en contra del que resulta obligado y hasta dejarlo sin efecto, si esto fuese necesario. *Noriega v. Gobernador*, supra. Esto fue precisamente lo que hizo el tribunal al aceptar la estipulación de las partes que declaraba académico el remedio interdictal previamente dictado.

Erró, por lo tanto, el tribunal de instancia al entrar a considerar la constitucionalidad de la Ley Núm. 22, *supra.*

# III

La también impugnada Sec. 1 de la Ley Núm. 21 del Código Penal, *supra*, nos indica que:

*Sec. 1447. — Ambulancias, carros de bombas y campanas de iglesias, exentos*

Quedan exentos del cumplimiento de las secs. 1443 a 1448 de este título los conductores de ambulancias y carros de bombas de incendio mientras estuvieren prestando el servicio apropiado a la naturaleza de dichos vehículos. No se entenderá que es ruido innecesario el producido por las campanas de las iglesias en el ejercicio de sus funciones y cultos religiosos, así como tampoco el que puedan generar los cultos o ritos de las iglesias, sectas o denominaciones religiosas debidamente establecidas; Disponiéndose que nada de lo aquí dispuesto limitará los poderes de la Junta de Calidad Ambiental para promulgar los reglamentos a que está autorizada por ley.[6]

Con relación a la determinación de inconstitucionalidad de la Ley Núm. 21, *supra*, tenemos que, además de no ser necesario entrar a determinar la constitucionalidad de la misma para resolver la controversia planteada, la acción presentada por los demandantes no está dirigida contra aquellos llamados a implantar sus disposiciones: la Policía

---

[6] Las secciones pertinentes son las Secs. 1 y 4 de la Ley Núm. 71 de 26 de abril de 1940 (33 L.P.R.A. secs. 1443 y 1446), que disponen:

*"Sec. 1443. Supresión de ruidos innecesarios*

"Por la presente se prohíben los ruidos innecesarios de todas clases provenientes del uso del claxon o aparato de alarma en la zona urbana, radios en casas de comercio, cafés y otros sitios públicos, altoparlantes que circulen por las calles con fines comerciales, campanas del tranvía eléctrico, pitos del tren en la zona urbana, bocinas y sirenas de bicicletas, y cualesquiera otros también innecesarios que se produzcan por medio de cualquier otro aparato, utensilio o instrumento, no importa su nombre, naturaleza o denominación."

*"Sec. 1446. Tribunal que conocerá de infracciones; penalidades*

"El Tribunal de Distrito conocerá de las violaciones de las secs. 1443 a 1448 de este título, y las mismas serán consideradas como un delito menos grave aparejando multa no menor de veinticinco (25) dólares ni mayor de cien (100) dólares. Disponiéndose, que cuando se haya alterado el mecanismo normal de un automóvil con el propósito de producir ruido, la multa no será menor de veinticinco (25) dólares ni mayor de doscientos cincuenta (250) dólares."

de Puerto Rico y los fiscales del Departamento de Justicia. Tampoco surgió dentro de un proceso criminal.

El Estado sólo compareció como interventor para defender la constitucionalidad de las leyes impugnadas. Regla 21.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III. De acuerdo con los Comentarios que acompañaron la Regla 21.3 de Procedimiento Civil de 1979, "[e]sta regla cubre lo dispuesto en la Ley número 47 de 25 de abril de 1931 sobre Sentencias Declaratorias (32 L.P.R.A. sec. 3001) y *amplía lo dispuesto en la Ley número 451 de 14 de mayo de 1952 (32 L.P.R.A. sec. 353)*, haciendo mandatorio el requisito de notificación al Estado en los casos en que se impugna la constitucionalidad de una ley, así como también aquellos en los que se impugna la constitucionalidad de una orden ejecutiva, franquicia o reglamento administrativo, para que el Estado determine si ejercita o no el derecho a intervenir que le concede el estatuto". (Énfasis suplido.) 32 L.P.R.A. Ap. III, R. 21.3 n. Bajo esta regla, el Estado, como cuestión de derecho, puede intervenir en un caso al solo efecto de defender "la constitucionalidad de una ley, orden ejecutiva, franquicia o reglamento administrativo del Estado Libre Asociado de Puerto Rico ...", 32 L.P.R.A. Ap. III, R. 21.3. Su interés en el asunto no se extiende más allá de esto.

Estamos ante un caso entre partes privadas encaminado a dilucidar los intereses privados de éstas. Los demandantes pretendían obtener un remedio interdictal contra los demandados para que se les ordenara cesar y desistir de una conducta que les estaba causando daño irreparable al no permitirles disfrutar de paz y tranquilidad en su hogar. Para vindicar estos intereses privados reclamaron a los demandados el resarcimiento por los daños ocasionados.

Un estatuto penal como lo es la Ley Núm. 21, *supra,* sólo puede ser implantado por el Estado a través de los funcionarios a quienes la ley les impone ese deber y es

contra éstos, en su carácter oficial, que hay que dirigir cualquier orden interdictal de cesar o desistir o de hacer. Sería el Estado o estos funcionarios en su carácter personal, los llamados a responder por los daños que la acción o inacción hubiese causado a una persona.

Bajo estas circunstancias, faltaban partes indispensables para poder válidamente considerar el planteamiento de inconstitucionalidad de las disposiciones penales de la Ley Núm. 21, *supra*. Regla 16.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III; *Granados v. Rodríguez Estrada II*, 124 D.P.R. 593 (1989). El tribunal, al determinar su inconstitucionalidad, realmente emitió una opinión consultiva. *E.L.A. v. Aguayo*, supra.

Por las razones antes expuestas, estamos conformes y concurrimos con la sentencia que hoy se emite.

– O –

Opinión concurrente y de conformidad emitida por el Juez Asociado Señor Rafael Alonso Alonso.

En *Neptune Packing Corp. v. Wackenhut Corp.*, 120 D.P.R. 281 (1988), expresamos que las Reglas de Procedimiento Civil, 32 L.P.R.A. Ap. III, se inspiran en tres (3) valores fundamentales, recogidos en la Regla 1, a saber, justicia, rapidez y economía, que están enmarcados en la norma de buena fe que debe permear la tramitación de toda causa de pedir. Para lograr esos objetivos señalamos que el enfoque del ordenamiento procesal y sustantivo debía ser integral, pragmático y creativo, de suerte que con voluntad, sinceridad y acción dichos valores cobraran vida y se convirtieran en vivencias y realidades cotidianas.

Bajo esta perspectiva, los mecanismos procesales disponibles a las partes sólo existen para hacer viable la consecusión del derecho sustantivo y los remedios a que son acreedoras, puesto que no debe sobreponerse la forma a la

sustancia. *McCrillis v. Aut. Navieras de P.R.*, 123 D.P.R. 113 (1989); *Pueblo v. Hernández Torres y Barreda*, 125 D.P.R. 560 (1990).

Esta concepción amplia sobre los mecanismos procesales nos ha permitido reiteradamente resolver que la justicia no depende de etiquetas, de suerte que un error de carácter nominal no altera el hecho sustancial y la naturaleza de la cosa. Lo determinante es su esencia y no la invocación errónea del remedio. Regla 70 de Procedimiento Civil, 32 L.P.R.A. Ap. III.

Después de todo, son los hechos alegados en la reclamación y la prueba que sustenta los mismos lo que determina la causa de acción, y no el nombre que las partes le hayan dado. La función de los tribunales es, pues, conceder el remedio a que tenga derecho una parte de acuerdo con el derecho sustantivo y con la prueba, con independencia de la denominación que las partes utilizaron para denominar la acción. Reglas 43.6 y 70 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Nuestro procedimiento civil se caracteriza por la flexibilidad de procesos y remedios con el fin de hacer justicia. *Cf. Merheb v. Benero Natal*, 119 D.P.R. 508 (1991), opinión disidente. No caben los "moldes técnicos que limiten o aprisionen los remedios justos". *Negrón Rivera y Bonilla, Ex parte*, 120 D.P.R. 61, 73 (1987).

El caso de autos se inició como una acción de *injunction* por alegado estorbo público. 32 L.P.R.A. sec. 2761. Durante la tramitación del pleito llegó el punto en que las partes estipularon que el remedio de *injunction* se había tornado académico y, en vista de ello, el foro de instancia dejó sin efecto el *injunction* preliminar que había dictado. No obstante, dicho foro dejó en vigor su determinación de daños y su decreto de inconstitucionalidad del Art. 277 de la Ley Núm. 22 de 29 de abril de 1974 (32 L.P.R.A. sec. 2761); de la Ley Núm. 21 de 29 de abril de 1974 (33 L.P.R.A. sec. 1447) y el Art. 4.6 del Reglamento para el Control de la

Contaminación por Ruidos de la Junta de Calidad Ambiental, versión enmendada, de 25 de febrero de 1987.

Para todos los efectos prácticos, tal determinación convirtió esta acción, que se originó como un *injunction* estatutario, en una acción ordinaria en reclamación del remedio económico de daños. *Cf. Cobos Liccia v. Dejean Packing Co., Inc.*, 124 D.P.R. 896 (1989). Resultaba innecesario, pues, entrar a considerar la constitucionalidad o no del *injunction* estatutario originalmente solicitado y de las leyes y sección reglamentaria correspondiente.

Hemos resuelto que los remedios disponibles al ciudadano bajo el Art. 277, *supra*, son distintos e independientes el uno del otro. Una vez cesa la perturbación, son independientemente justiciables los daños puesto que no es necesario la coexistencia de tales remedios como requisito *sine qua non* para su reconocimiento individual.

La flexibilidad de los procesos de nuestro sistema jurídico les permitía a los aquí apelados encontrar justicia individual en sus reclamos por diversas vías. A la luz de como se desarrollaron los sucesos, el trámite ordinario y la debida compensación en daños como remedio resultaron suficientes para poner fin a la controversia. No importa, pues, cómo se nominara la acción en su origen.

Visto el desarrollo de los procedimientos en este caso, resultaba innecesario cualquier pronunciamiento sobre constitucionalidad de la acción bajo cuyo acápite se inició este pleito.

Por tales razones, revocaría el decreto de inconstitucionalidad hecho por el foro de instancia y modificaría la sentencia para sólo compensar las angustias mentales en veinticinco mil dólares ($25,000).

— O —

Opinión concurrente y disidente emitida por el Juez Asociado Señor Rebollo López.

La Opinión concurrente y disidente —*suscrita por el Juez Asociado Señor Hernández Denton y a la cual se unen el Juez Presidente Señor Pons Núñez y el Juez Asociado Señor Andréu García*— resolvería y decretaría que la Ley Núm. 22 de 29 de abril de 1974([1]) y el Art. 4.6 del Reglamento para el Control de Contaminación por Ruidos de la Junta de Calidad Ambiental, versión enmendada, de 25 de febrero de 1987, "son inconstitucionales por estar en conflicto con la Sec. 3 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, que prohíbe el establecimiento de cualquier religión". Opinión concurrente y disidente del Juez Asociado Señor Hernández Denton, pág. 258. En la mencionada ponencia, se le imputa al resto de los integrantes del Tribunal *faltar* "a su obligación de imprimir mayor certeza a nuestro derecho en un asunto que genera polémicas intensas en todo el país" (íd., pág. 278), al negarse a suscribir la posición antes mencionada; ello, conforme los mencionados tres Jueces, por razón del temor a las "intensas presiones públicas" (íd., pág. 305) que generaría el referido decreto de inconstitucionalidad.

*Nada más lejos de la realidad.* Cuando se actúa con tranquilidad de espíritu y consciencia, no hay por qué temerle ni a las "presiones" ni "al qué dirán". La razón para no suscribir dicha posición —cuando menos, en cuanto al Juez suscribiente— es bien sencilla: dados los hechos particulares del presente caso, la posición que sostienen los referidos tres Jueces *es una errónea e improcedente en derecho.*

---

([1]) La referida Ley Núm. 22 (32 L.P.R.A. sec. 2761) excluye a las instituciones religiosas de la acción interdictal por perturbación o estorbo público.

I

Para que una ponencia en un caso normal y corriente, elaborada y suscrita por uno de los integrantes del Tribunal, pueda ser certificada como "Opinión del Tribunal" se requiere que la misma obtenga el *voto de conformidad* de por lo menos cuatro de los integrantes de este Foro judicial, en la situación en que todos sus miembros intervienen en el caso, o de por lo menos la "mitad más uno" de los Jueces que participan en el caso, en la alternativa de que algunos de sus integrantes se hayan inhibido o abstenido de intervenir en el mismo.

El voto de conformidad —a diferencia de cuando meramente se "concurre con el resultado"— que le brinda un Juez a la ponencia suscrita por uno de sus compañeros magistrados *significa* que ese Juez está conforme no sólo con el resultado a que se llega en la ponencia emitida sino que suscribe todos y cada uno de los fundamentos que se aducen en apoyo de ese resultado. Cuando meramente se "concurre con el resultado", *no* se endosan necesariamente todos los fundamentos aducidos en la ponencia en apoyo del resultado a que se llega.

Dicha función es una que no puede ser descargada "ligera" o caprichosamente por los integrantes de un tribunal colegiado como el nuestro. Como es de todos conocido, una "Opinión del Tribunal" resulta obligatoria, como precedente, para nuestros tribunales de instancia. Ello, en palabras sencillas, significa que dicha Opinión constituirá derecho vinculante en relación con las decisiones que emitan los referidos tribunales de instancia en el futuro en toda situación de hechos similar a la envuelta en el caso objeto de la "Opinión del Tribunal". Ahí radica, naturalmente, la importancia de que los fundamentos legales que se aducen en una Opinión en apoyo del resultado propuesto sean jurídicamente correctos.

No hay duda, en resumen, que la determinación que a

diario tienen que hacer los integrantes de este Tribunal respecto a si endosan o no con su voto de conformidad las numerosas ponencias que se circulan en el seno del Tribunal, y si éstas ameritan o no ser publicadas como "Opinión del Tribunal", es una importante y fundamental para nuestro sistema de derecho. Es por ello que dicha determinación sólo debe ser el producto de un análisis jurídico objetivo y desapasionado; *totalmente libre el mismo de consideraciones de amistad, enojo o prejuicio personal.*

Ese análisis sereno e imparcial nos impide, *por los fundamentos que expondremos a continuación,* dar nuestra conformidad a la opinión concurrente y disidente emitida por el Juez Asociado Señor Hernández Denton, la cual es endosada por otros dos Jueces de este Tribunal.

## II

En primer lugar, *el "decreto" de inconstitucionalidad* contenido en la opinión concurrente y disidente suscrita por el Juez Hernández Denton —referente el mismo a las Leyes Núms. 21 (33 L.P.R.A. sec. 1447) y 22 (32 L.P.R.A. sec. 2761) de 29 de abril de 1974— *es uno total y completamente innecesario.* Constituye *doctrina jurídica trillada* que la validez de las leyes se presume; que, como consecuencia de dicha presunción, los tribunales *no* juzgarán *ni* pasarán juicio sobre la validez constitucional de un estatuto *a menos que* ello fuese *imprescindible* para poder resolver el caso ante su consideración, *E.L.A. v. Aguayo,* 80 D.P.R. 552 (1958); *Bordas &. Co. v. Srio. de Agricultura,* 87 D.P.R. 534 (1963); *P.I.P. v. E.L.A.,* 109 D.P.R. 685 (1980); y que los tribunales *no* se anticiparán a decidir una cuestión de derecho constitucional antes de que sea necesario hacerlo. *Esso Standard Oil v. A.P.P.R.,* 95 D.P.R. 772 (1968).

En el presente caso, la parte demandante acudió ante el tribunal de instancia en solicitud de remedio interdictal, y

daños y perjuicios, contra la parte demandada. Consciente el demandante de las disposiciones de las citadas Leyes Núms. 21 y 22 de 1974, las cuales establecían un trámite administrativo ante la Junta de Calidad Ambiental, notificó éste al señor Secretario de Justicia de su intención de cuestionar la constitucionalidad de los referidos estatutos.

Como surge, inclusive, de la referida Opinión concurrente y disidente emitida, *en un momento dado del procedimiento habido ante el tribunal de instancia las partes estipularon la academicidad del recurso de interdicto radicado*(2); únicamente quedando *pendiente de resolución* por el tribunal de instancia la *acción independiente* de daños y perjuicios incoada por la parte demandante. *Resulta obvio, en consecuencia, que habiéndose·convertido en académico el recurso de "injunction", el planteamiento sobre la inconstitucionalidad de las citadas Leyes Núms. 21 y 22 de 1974 se esfumó como por arte de magia, resultando totalmente innecesario tan siquiera referirse al mismo por cuanto dicho planteamiento resulta ser total y completamente impertinente en la consideración y adjudicación de la reclamación sobre daños y perjuicios.*

Como correctamente señala el Juez Asociado Señor Negrón García en su ponencia, el tribunal de instancia utilizó, como fuente legal para la concesión de daños, el Art. 1802 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 5141. Ello hace innecesario la utilización, en esta etapa apelativa, del Art. 277 del Código de Enjuiciamiento Civil de 1933 (32 L.P.R.A. sec. 2761). Dicho argumento no pasa de ser una *excusa* que utilizan estos tres compañeros Jueces con el propósito de sostener que el asunto de la constitucionalidad de la citada Ley Núm. 22 de 1974 no se ha tornado en académico.

---

(2) La referida estipulación tuvo como base el hecho de que el demandante Lasso de la Vega, y su familia, se mudaron de su residencia con motivo de haber vendido la misma.

*Es por ello que llama poderosamente la atención su insistencia en pasar juicio sobre la constitucionalidad del mencionado estatuto "so color" o pretexto de que nos enfrentamos a una de las excepciones a la doctrina sobre academicidad.* Dicho decreto de inconstitucionalidad, repetimos, se emitiría no sólo en relación a una acción que resulta ser a todas luces académica *sino que se haría en grave menosprecio, y violación, de la norma de autorrestricción judicial que debemos observar al enfrentarnos a la situación en que se nos plantea la inconstitucionalidad de un estatuto;* norma de *autolimitación judicial* que, como es sabido, *se basa* en el reconocido principio de que en esta clase de situaciones la revisión judicial resulta ser, en gran medida, incompatible con nuestra forma republicana de gobierno, la cual descansa sobre bases democráticas. *No debe haber duda alguna, en consecuencia, de que venimos obligados a actuar en esta clase de situaciones en una forma prudente y comedida.* Como certeramente indicamos en *E.L.A. v. Aguayo*, ante, págs. 597–599:

> *¿Qué fundamento tienen esas limitaciones?* ¿Han sido creadas para satisfacer las exigencias de un preciosismo técnico, o están por el contrario sustentadas por una convicción, a la cual abonan la razón y la experiencia, *de cómo debe ejercitarse la gravísima responsabilidad judicial de juzgar la constitucionalidad de las actuaciones legislativas?* Es indudable que constituyen un mínimo de condiciones para *el ejercicio discreto y tolerable de un poder que de otro modo constituiría una clara amenaza para la calidad democrática del sistema y convertiría a los jueces en guardianes de la comunidad.* Factores determinantes de estas normas son la falibilidad del juicio humano, *la condición negativa del poder judicial que no posee la autoridad directa que adviene a las otras dos ramas por ser electas por el pueblo,* y la convicción de que la Corte perdería su influencia y prestigio y finalmente su autoridad, *si, a diario, y fuera de los estrictos límites de un genuino procedimiento judicial, estuviese pasando juicio sobre la validez constitucional de las actuaciones legislativas y ejecutivas.*
>
> .   .   .   .   .   .   .   .
>
> *... Pero hay en el caso nuestro un factor adicional. La Sección*

*4 del Artículo V de nuestra Constitución, al reconocer expresamente la facultad de este Tribunal para decretar la inconstitucionalidad de las leyes, provee como sigue: "Ninguna ley se declarará inconstitucional a no ser por una mayoría del número total de los jueces de que esté compuesto el Tribunal de acuerdo con esta Constitución o con la Ley." Esa limitación no se encuentra en la Constitución federal ni en las de la gran mayoría de los estados de la Unión. ¿Por qué se incluyó en la nuestra?* Afortunadamente, el extenso debate que precedió a su aprobación por la Convención Constituyente nos ofrece la respuesta. Está explicada sucintamente en las siguientes palabras:

"Yo quiero decir que hace tiempo que se viene discutiendo por las personas preocupadas por estos problemas constitucionales si es válido, si es razonable que un grupo de jueces reducido... tenga la prerrogativa de ir en contra de la voluntad expresada por el pueblo al ordenar un programa de legislación que es luego puesto en ejecución por los legisladores electos a base de ese programa.

. . . . . . . .

... Sencillamente eso lo que requiere es que una ley, y no empecemos por ley cuando ya está en los estatutos, sino que una disposición que una Cámara de Representantes creyó que era buena y que era constitucional y que un Senado creyó que era buena y que era constitucional y que un ejecutivo creyó que era buena y que era constitucional, antes de convertirse en ley, se requiera que una mayoría absoluta de los jueces para decir que no lo es, tengan que concurrir y que no pueda resultar, resuelto así, contra la propia mayoría de la Cámara, contra la opinión de la mayoría del Senado y contra la opinión del Ejecutivo, resuelto por una minoría del tribunal."

*Evidentemente, la Convención tuvo plena conciencia de la "gravedad y delicadeza" de esta función judicial y actuó para limitarla aún más de lo que voluntariamente lo han hecho los tribunales federales.* (Énfasis suplido y escolios omitidos.)

La acción que proponen estos tres Jueces ciertamente *no* es ejemplo de prudencia y circunspección judicial. El curso decisorio a seguir en el presente caso —*la adjudicación y solución de la acción remanente de daños y perjuicios mediante la emisión de una simple "Sentencia" a esos efectos*— es tan obvio y palpable, que hace que su propuesta, esto es, la de decretar la inconstitucionalidad de las Leyes Núm. 21 y 22 de 1974, sea una completamente desacer-

tada, *totalmente enajenada de "la gravedad y delicadeza"
con que debemos ejercer la función judicial que
desempeñamos. E.L.A. v. Aguayo,* ante. La misma única-
mente puede responder a una de dos motivaciones: *la in-
saciable sed de publicar "Opiniones" o la existencia de un
interés, o agenda, particular y personal.*

## III

Independientemente de lo anteriormente expuesto exa-
minamos, en segundo lugar, *la juridicidad* de los funda-
mentos expuestos por estos Jueces en apoyo de su pro-
puesto decreto de inconstitucionalidad. La misma, cuando
menos, *es una cuestionable y dudosa.*

La Sec. 3 del Art. II de la Constitución del Estado Libre
Asociado de Puerto Rico establece que:

> No se aprobará ley alguna relativa al establecimiento de
> cualquier religión ni se prohibirá el libre ejercicio del culto
> religioso. Habrá completa separación de la iglesia y el estado.
> Art. II, Sec. 3, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág.
> 262.

*¿Qué tuvieron en mente los integrantes de la Asamblea
Constituyente al incorporar a nuestro ordenamiento la an-
tes transcrita disposición constitucional?* El historial al res-
pecto de la Constituyente, aun cuando algo parco, es suma-
mente revelador: *llana y sencillamente incorporaron en su
totalidad la teoría constitucional norteamericana referente
a la Primera Enmienda de la Constitución federal según
ésta ha sido interpretada por el Tribunal Supremo de los
Estados Unidos.* Ello así diáfanamente surge de un exa-
men del Diario de Sesiones de la Convención Constitu-
yente de Puerto Rico. En palabras del delegado Lcdo. José
Trías Monge:

> O sea, aquí hay dos principios básicos que se instituyen en
> esta sección. Uno es el principio de separación del Estado e

Iglesia, *tal como ha sido consignado en la Constitución federal y el cual seguirá su desarrollo normal vía las interpretaciones del Tribunal Supremo de los Estados Unidos.*

*Naturalmente que [en] distintas situaciones que pudiésemos imaginar en estos momentos, pues sería difícil una contestación precisa [en] muchos [casos] a estas situaciones, porque estamos enchufados ante el sistema constitucional norteamericano en esta fase específica. O sea, son nuestras las garantías en cuanto a libertad de religión que se han instituido en la Constitución de los Estados Unidos.* Estamos idénticamente, formando parte de ese sistema constitucional. (Énfasis suplido.)(³)

A esos mismos efectos, en *Agostini Pascual v. Iglesia Católica*, 109 D.P.R. 172, 175 (1979), este Tribunal expresó que:

La primera oración [de la transcrita Sección 3] incluye dos cláusulas familiares de la primera enmienda de la Constitución de Estados Unidos: la referente a la libertad de culto y la que prohíbe el establecimiento de una religión oficial. La tercera disposición guarda estrechos vínculos con las otras dos y, aunque es nueva en su forma, tiene una larga historia. *Esta tercera cláusula refleja fundamentalmente la teoría de Madison de que la relación ideal entre el Estado y la Iglesia exige el reconocimiento de dos esferas de acción separadas.* (Énfasis suplido.)

Conforme surge del *excelente análisis histórico* que realiza el hoy Juez Presidente del Tribunal Supremo de los Estados Unidos, Hon. William Rehnquist, en la Opinión Disidente que emitiera en *Wallace v. Jaffree*, 472 U.S. 38, 91 (1984), James Madison y Thomas Jefferson *nunca tuvieron en mente que entre el Estado y la Iglesia debería de existir una "pared de separación" (the Wall)*; por el contrario, y conforme demuestra el Juez Presidente Rehnquist, el pensamiento de éstos fue a los efectos de que la prohibición contenida en la Primera Enmienda de la Constitución federal *únicamente iba dirigida a impedir el establecimiento de una religión oficial nacional y prohibir que el Estado discriminara entre sectas religiosas.*

---

(³) 2 Diario de Sesiones de la Convención Constituyente 1483–1484 (1952).

La referida Opinión del Juez Hernández Denton pretende *erróneamente revivir*, con toda su fuerza, la hoy *obsoleta, maltrecha* y *desacreditada* teoría de la "pared de separación" (*the Wall*) entre Iglesia y Estado que hace muchos años elaboró el Tribunal Supremo federal en *Everson v. Board of Education*, 330 U.S. 1, 16 (1947). Dicha Opinión concurrente y disidente *pasa por alto, o ignora*, el hecho de que *inclusive* el propio Tribunal Supremo de los Estados Unidos, *en posteriores decisiones*, ha reconocido que la referida teoría de la "pared de separación" *meramente constituye* una "borrosa, indistinta y variable barrera" que "no es enteramente precisa" y que "apenas puede ser percibida". *Lemon v. Kurtzman*, 403 U.S. 602, 614 (1971); *Tilton v. Richardson*, 403 U.S. 672, 677–678 (1971); *Wolman v. Walter*, 433 U.S. 229, 236 (1977); *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984); y pierde de perspectiva que la teoría de la "separación absoluta" entre Iglesia y Estado ha sido *prácticamente abandonada* por el Tribunal Supremo federal, acercándose cada día más dicho Foro judicial a *la teoría de neutralidad* de parte del Estado. *Cf.: Roemer v. Maryland Public Works Bd.*, 426 U.S. 736, 747 (1976); L.H. Tribe, *Constitutional Law*, 2da ed., Nueva York, Foundation Press, 1988, págs. 1166–1167.

Igualmente errónea, por otro lado, resulta ser la insistencia de estos tres integrantes del Tribunal en continuar aplicando literalmente, *como obedientes y autómatas escribientes*, el "criterio" (*test*) originalmente elaborado por el Tribunal Supremo federal en *Lemon v. Kurtzman*, ante, que prohíbe aquella acción estatal que contiene un "propósito o efecto sectario" y que causa un "envolvimiento excesivo impermisible" con la religión. La referida Opinión concurrente y disidente emitida, la cual pretende que se aplique el mencionado "criterio" en la solución del recurso ante nuestra consideración como si el mismo no hubiera sufrido erosión alguna en la esfera federal, *nuevamente pasa por alto, o ignora*, que el referido "criterio" ha sido

posteriormente descrito por los integrantes del Tribunal Supremo federal como meramente una "guía", *Committee for Public Education v. Nyquist*, 413 U.S. 756 (1973); y como uno "no más útil que la señal de un poste", *Mueller v. Allen*, 463 U.S. 388 (1983); *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116 (1982). Como si ello fuera poco, tenemos que el Tribunal Supremo de los Estados Unidos, en *Lynch v. Donnelly*, ante, expresó que el referido "criterio" era uno que nunca había sido obligatorio (*binding*) para dicho alto Tribunal, negándose dicho Foro, inclusive, a aplicar el mismo en dos casos que llegaron ante su consideración. Véanse: *Marsh v. Chambers*, 463 U.S. 783 (1983); *Larson v. Valente*, 456 U.S. 228 (1982).

Como resulta obvio de todo lo anteriormente expuesto, la Opinión del Juez Hernández Denton, la cual decretaría la inconstitucionalidad de las citadas Leyes Núms. 21 y 22 de 1974 es una que no sólo se emitiría en relación con *un asunto que se tornó académico*, sino que la misma descansa sobre unas *maltrechas y obsoletas teorías constitucionales* que son aplicadas en forma *automática y mecánica* por el Tribunal. *En fin, se trataría de una decisión innecesaria, poco imaginativa y creadora* de este Foro, *que no aporta nada nuevo a nuestra jurisprudencia; razones por las cuales nunca podría ser certificada como "Opinión" de este Tribunal.*

## IV

Por último, *disentimos vehementemente* de la acción de la mayoría del Tribunal confirmando la actuación del foro de instancia concediéndole a la parte demandante, por concepto de las "angustias mentales" *alegadamente* sufridas por dicha parte como consecuencia de la supuesta conducta dañina observada por la demandada Iglesia Cristiana Pentecostal La Nueva Jerusalem, la improcedente suma de veinticinco mil dólares ($25,000).

De entrada debemos señalar que —*a pesar de que nos resulta un tanto difícil comprender cómo el escuchar la palabra de Dios, y cánticos alusivos a Éste, pueda causarle daño a una persona*— reconocemos que unos servicios religiosos pueden "pertubar" la paz y tranquilidad de un vecindario si los mismos son ampliados y retransmitidos fuera de la iglesia en forma estentórea y exagerada.

*Ello no obstante, somos del criterio que, dados los hechos particulares y específicos del presente caso, constituye un grave error, y una trágica injusticia, la acción del Tribunal al confirmar la actuación del tribunal de instancia sobre concesión de daños.* En primer lugar, las *determinaciones de hecho* en que descansa dicha actuación *no son confiables.* Las mismas forman parte de una "sentencia" que a todas luces fue un *"proyecto de sentencia"* que le fuera sometido por la parte demandante al juez de instancia y que éste firmara a ciegas.[4] Varias son las ocasiones en que este Tribunal ha manifestado su preocupación sobre ello. Como es sabido, hemos expresado que a pesar de que no existe una prohibición como tal al respecto, dichos proyectos *únicamente* deben ser utilizados como "documentos de trabajo" (*working papers*). Ello debido a que la sentencia que emite un tribunal de instancia debe enteramente ser el producto del pensamiento, análisis y criterio jurídico del juez sentenciador y no de los abogados de las partes. Véanse: *Malavé v. Hosp. de la Concepción*, 100 D.P.R. 55 (1971); *Román Cruz v. Díaz Rifas*, 113 D.P.R. 500 (1982); *Arroyo v. Rattan Specialties, Inc.*, 117 D.P.R. 35 (1986); *Báez García v. Cooper Labs., Inc.*, 120 D.P.R. 145 (1987); Canon 2 de Ética Judicial, 4 L.P.R.A. Ap. IV-A.

---

[4] La "mejor evidencia" de ello lo constituye la sentencia emitida por el foro de instancia. En la página doce, última página de la misma, el abogado que preparó dicho proyecto de sentencia dejó "en blanco" —para ser llenado, a mano y en tinta, por el juez de instancia— las partes correspondientes a las sumas de dinero a concederse por concepto de indemnización y honorarios de abogado. Dicho magistrado así lo hizo.

Por otro lado, un análisis cuidadoso de la transcripción de evidencia que ordenáramos preparar en el presente caso demuestra que la prueba que la parte demandante presentara respecto a la alegada conducta nociva observada por la Iglesia y a las alegadas angustias mentales que sufriera dicha parte como consecuencia de los servicios religiosos que llevara a cabo la Iglesia demandada es una que no sólo luce cuidadosamente preparada y orquestada sino que la misma es contradictoria, *no representando las determinaciones de hecho realizadas por el tribunal de instancia el balance más racional, justiciero y jurídico de la totalidad de la evidencia que desfilara ante dicho tribunal, razón por la cual las mismas no deberían de prevalecer. Sanabria v. Sucn. González,* 82 D.P.R. 885 (1961); *Maryland Casualty Co. v. Quick Const. Corp.,* 90 D.P.R. 329 (1964); *Abudo Servera v. A.T.P.R.,* 105 D.P.R. 728 (1977); *Ramos Acosta v. Caparra Dairy, Inc.,* 113 D.P.R. 357 (1982).

La *mejor evidencia* de lo antes expresado lo constituye el hecho de que conforme el testimonio prestado por el Sr. Héctor L. Valencia Class —quien declaró como testigo de la parte demandante y que se desempeña como Inspector de la División de Control de Ruido de la Junta de Calidad Ambiental— en la ocasión en que él inspeccionó el lugar encontró o determinó que el sonido que provenía de la Iglesia demandada ascendía a "unos niveles de sesenta ... y un decibel", *no* excediendo dicho nivel del "límite establecido por el reglamento para el control de la contaminación por ruido", el cual es el de sesenta y cinco (65) decibeles.[5] Después de todo no debemos olvidar que, aun cuando el arbitrio del juzgador de los hechos es respetable, una *apreciación errónea* de la prueba *no* tiene credenciales de inmunidad frente a la función revisora de este Tribunal. *Vda. de Morales v. De Jesús Toro,* 107 D.P.R. 826 (1978).

---

[5] Véase la pág. 23 de la Transcripción de Evidencia correspondiente a la vista celebrada ante el tribunal de instancia el día 10 de noviembre de 1986.

Resulta, a nuestro entender, *verdaderamente lamentable que este Tribunal prácticamente condene a la ruina económica a una institución religiosa a base de una prueba altamente sospechosa e irreal, la cual adolece de espontaneidad y veracidad.* La errónea decisión mayoritaria hoy emitida únicamente puede deberse a la *inexperiencia* de algunos miembros de este Tribunal en la aquilatación de *prueba* y al *criterio*, erróneo y personal, reinante en la mayoría del Tribunal a los efectos de que el derecho a la intimidad es uno de mayor rango e importancia que el derecho a la libertad de culto.

No hay duda de que los integrantes de este Tribunal tienen el derecho absoluto a pensar acorde con su particular y personal visión de la vida y del mundo en que se desenvuelven; *derecho que, inclusive, les permite ser creyentes o agnósticos.* A lo que *no tienen derecho* los miembros de esta Institución es a resolver los asuntos judiciales que vienen ante la consideración de este Foro conforme a esas creencias personales *con total abstracción de lo que es o no justo y jurídicamente procedente.*(⁶)

Mediante la decisión hoy emitida, este Tribunal le ha negado a la Iglesia Cristiana Pentecostal La Nueva Jerusalem —institución sin fines de lucro que predica la moral, la paz y la justicia divina— la justicia terrenal a que la misma tiene derecho. *Nos negamos a ser cómplices de dicha actuación.*

En consecuencia, y por los fundamentos antes expresados, estamos conformes con la decisión de una mayoría de

_____

(⁶) La prueba que desfilara ante el tribunal de instancia demostró no sólo que el sonido proveniente de los servicios religiosos que llevaba a cabo la Iglesia demandada *no* excedía del nivel máximo permitido por la Junta de Calidad Ambiental, sino que dicha Iglesia contaba con el permiso correspondiente emitido por las autoridades pertinentes, la Administración de Reglamentos y Permisos —A.R.Pe.— para estar localizada en el vecindario en controversia. Surge de la prueba presentada a nivel de instancia que A.R.Pe. concedió el permiso correspondiente el día 19 de diciembre de 1980.

los integrantes del Tribunal de abstenerse de entrar a considerar la constitucionalidad de la Ley Núm. 22 de 29 de abril de 1974.

Disentimos, sin embargo, de la determinación mayoritaria que concede la suma de veinticinco mil ($25,000) a la parte demandante por los alegados daños y perjuicios sufridos por dicha parte.

— O —

Opinión concurrente y disidente emitida por el Juez Asociado Señor Hernández Denton, a la cual se unen el Juez Presidente Señor Pons Núñez y el Juez Asociado Señor Andréu García.

Este recurso nos permite examinar la constitucionalidad de la Ley Núm. 22 de 29 de abril de 1974, Art. 277 del Código de Enjuiciamiento Civil de 1933 (32 L.P.R.A. sec. 2761), que excluye a las instituciones religiosas de la acción interdictal por perturbación o estorbo público. En específico, adjudicamos una controversia que es secuela de nuestra decisión en *Sucn. de Victoria v. Iglesia Pentecostal*, 102 D.P.R. 20 (1974), donde resolvimos que los ciudadanos podían utilizar el *injunction* de estorbo público para vindicar su derecho a la paz y tranquilidad en sus hogares contra actuaciones de otras personas y entidades, incluyendo a las instituciones religiosas.

La controversia en el caso de autos nos obliga nuevamente a resolver un conflicto entre estos derechos fundamentales y establecer un balance entre la libertad de culto y el derecho de intimidad al amparo de la cláusula constitucional que prohíbe el establecimiento de una religión. En vista de la importancia en nuestra sociedad de los valores protegidos por estos preceptos constitucionales, y considerando que en la interacción humana y comunitaria se generan conflictos entre ellos, corresponde a este Tribunal la

responsabilidad constitucional de proveer un foro para ventilar las diferencias y establecer un balance adecuado entre los distintos intereses. También tenemos la ineludible obligación de ser los intérpretes finales de la Constitución y de pautar las normas que guíen a futuras generaciones y ayuden a resolver los conflictos en una sociedad pluralista y democrática.

Desafortunadamente, en el caso de autos el Tribunal no ha descargado cabalmente esta responsabilidad. Aunque estamos conformes con la modificación de las cuantías concedidas para indemnizar los daños sufridos por la familia Lasso de la Vega, disentimos de la decisión del Tribunal de revocar el dictamen de inconstitucionalidad de la Ley Núm. 22, *supra.* Con esta decisión este Foro pospone la resolución de una controversia de gran importancia y falta a su obligación de imprimir mayor certeza a nuestro derecho en un asunto que genera polémicas intensas en todo el país. Véase la opinión disidente del Juez Presidente Señor Pons Núñez en *Pueblo Int'l, Inc. v. Srio. de Justicia,* 122 D.P.R. 703 (1988).

Por las razones expuestas en esta opinión, resolveríamos que la Ley Núm. 22, *supra*, y el Art. 4.6 del Reglamento para el Control de Contaminación por Ruidos de la Junta de Calidad Ambiental, versión enmendada, de 25 febrero de 1987 (en adelante Reglamento), son inconstitucionales por estar en conflicto con la Sec. 3 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, que prohíbe el establecimiento de cualquier religión.

## I

Después de gestionar infructuosamente ante la Policía de Puerto Rico y la Junta de Calidad Ambiental el control de los ruidos provenientes de un templo aledaño a su residencia, el Sr. Cayetano Lasso de la Vega y sus hijos presen-

taron una solicitud de entredicho provisional, e *injunction* preliminar y permanente contra la Iglesia Cristiana Pentecostal La Nueva Jerusalem (en adelante Iglesia) y sus ministros ante la Sala de Caguas del Tribunal Superior.

Lasso de la Vega notificó al Secretario de Justicia su intención de impugnar la constitucionalidad de la Ley Núm. 22, *supra*, sobre estorbo público, la Ley Núm. 21 de 29 de abril de 1974 (33 L.P.R.A. sec. 1447), y el Art. 4.6 del Reglamento porque estos excluían a la iglesia de su aplicación.

El 29 de octubre de 1986 el tribunal de instancia emitió una orden *ex parte* de entredicho provisional para que los demandados moderaran el uso de los instrumentos musicales, eliminaran las bocinas del templo y se abstuvieran de realizar actos que afectaran la intimidad y la propiedad de los demandados.

La orden estuvo en vigor hasta el 10 de noviembre de 1986 cuando, tras la celebración de una vista, se expidió un *injunction* preliminar. Nuevamente se le prohibió a los demandados usar bocinas en el templo, utilizar indiscriminadamente instrumentos musicales, cantar a viva voz de forma exageradamente alta y realizar otros actos similares. El 26 de febrero de 1987 se celebró una vista en rebeldía, a la cual compareció el Estado a defender la constitucionalidad de las leyes. Escuchada la prueba, el tribunal dictó sentencia en rebeldía y expidió el *injunction* solicitado.

Ante una moción de relevo de sentencia, el tribunal a quo ordenó la celebración de una vista en la cual el Estado sometió su caso a base de un memorando de derecho previamente presentado. Examinada la prueba, el foro de instancia concluyó como cuestión de hecho que la iglesia, ubicada a treinta (30) metros de la residencia de la familia Lasso de la Vega, celebraba servicios religiosos cuatro (4) veces por semana: martes, miércoles y jueves por la noche, y los domingos entre las 8:00 A.M. y 1:00 P.M. Durante esas

ceremonias, los feligreses cantaban himnos en alta voz, hablaban a través de altoparlantes y utilizaban distintos instrumentos de viento y percusión, inclusive guitarras eléctricas, en forma exagerada, de tal modo que el ruido producido trascendía el ámbito del local y afectaba la paz y tranquilidad de los vecinos. Como el templo no tenía aire acondicionado ni paredes o techos acústicos, el sonido producido en las ceremonias se esparcía por todo el vecindario, particularmente sobre la residencia de la familia perjudicada.

El tribunal a quo concluyó también que las gestiones extrajudiciales de los demandantes para solucionar su situación fueron inútiles. En la sentencia el tribunal determinó que la Junta de Calidad Ambiental no tenía los recursos necesarios para resolver eficazmente la querella sometida por el señor Lasso de la Vega. Del testimonio pericial se desprende que la agencia sólo tenía dos (2) inspectores para efectuar las pruebas de medición de ruidos en todo el país y que les tomaba alrededor de doscientos cincuenta y seis (256) días resolver una querella. Por su parte, la Policía de Puerto Rico no intervino en la disputa porque la ley expresamente excluye del alcance del estatuto los sonidos producidos durante las ceremonias religiosas.

Agobiados los demandantes por la intensidad y la frecuencia de sonidos intolerables, y abrumados por la irritación y la desesperación, el tribunal determinó que éstos sufrieron graves daños emocionales que perturbaron su vida familiar y cambiaron sus respectivas personalidades. T.E., págs. 134–164. En su sentencia, el tribunal de instancia determinó que los sonidos excesivamente altos afectaron profundamente la convivencia familiar y ocasionaban severos conflictos entre Lasso de la Vega y sus hijos. Apuntó el tribunal, por ejemplo, que los hijos tenían que posponer sus estudios escolares hasta altas horas de la noche. La familia tampoco podía disfrutar de las actividades recreativas básicas de un hogar, tales como ver la tele-

visión, escuchar la radio o hablar por el teléfono. La situación desesperante llegaba a tal extremo que tampoco podían sostener conversaciones normales entre ellos y sus amistades; por consiguiente, se afectaron considerablemente las visitas a su hogar.

Como resultado de esta situación, Nancy Lasso de la Vega tuvo que recurrir a un especialista de la conducta humana para que la ayudara a enfrentarse a la situación. Por su parte, a Lasso de la Vega se le alteró su personalidad a tal extremo que cuando se celebró la vista estaba "a punto de desmoronarse sicológicamente". Sentencia, pág. 6. Como consecuencia de toda esta situación, el tribunal a quo señaló finalmente que la vida privada del demandante se había convertido "en un verdadero infierno para él y su familia". Íd. En tales circunstancias, era imposible la convivencia familiar pacífica.

Ante este cuadro fáctico de angustia y desesperación, y la ausencia de un instrumento eficaz para vindicar los derechos de la familia Lasso de la Vega, el tribunal decretó la inconstitucionalidad de las Leyes Núms. 21 y 22, *supra*, y la Sec. 1 de la Ley Núm. 71 de 26 de abril de 1940 (33 L.P.R.A. sec. 1443). También dictaminó, específicamente, que la forma en que los demandados practicaban el culto constituía un estorbo público. Concluido que esas actividades interrumpieron el libre y cómodo uso de su hogar, el tribunal a quo, al amparo del Art. 277 del Código de Enjuiciamiento Civil, *supra*, expidió el interdicto y condenó a los demandados a pagar solidariamente la suma de sesenta y cinco mil dólares ($65,000) por los daños y perjuicios ocasionados, y tresmil quinientos dólares ($3,500) por concepto de honorarios de abogado.

Dictada la sentencia, Lasso de la Vega presentó una moción de desacato. En la vista señalada, la parte demandada argumentó que Lasso de la Vega había vendido su propiedad y, por lo tanto, el remedio de *injunction* resultaba académico. El tribunal acogió el planteamiento de la Igle-

sia y dejó sin efecto únicamente el remedio del *injunction*, manteniendo el decreto de inconstitucionalidad de las leyes y la determinación de daños que procedía bajo el Código de Enjuiciamiento Civil.

Ante nos, los apelantes sostienen que erró el tribunal de instancia al declarar inconstitucionales las leyes antes mencionadas. Añaden que el demandante no tenía legitimación activa, que la controversia se tornó académica y que se concedieron daños especulativos.

## II

Evaluemos inicialmente los aspectos de academicidad y legitimación activa. Los apelantes sostienen que la controversia es académica porque el señor Lasso de la Vega vendió su propiedad durante los procedimientos de ejecución de sentencia. De los autos se desprende que en la vista de desacato las partes estipularon la academicidad del *injunction* y el tribunal dejó sin efecto el interdicto preliminar. No obstante, el foro de instancia ratificó su decreto de inconstitucionalidad de las leyes en controversia y dejó en vigor su determinación de daños.

La doctrina de academicidad aplica cuando, aun cumplidos los requisitos de justiciabilidad, cambios factuales o judiciales acaecidos durante el trámite judicial de una controversia convierten en académica o ficticia su solución. Esta doctrina persigue: (1) evitar el uso innecesario de los recursos judiciales; (2) asegurar la existencia de suficiente adversidad sobre las controversias para que sean adecuada y vigorosamente presentadas por ambas partes, y (3) evitar un precedente innecesario. *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715 724–725 (1980).[1]

---

[1] Aunque en reiteradas ocasiones el Tribunal ha adoptado implícitamente las expresiones sobre la doctrina de academicidad vertidas en la Parte II de *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715, 724-728 (1980), este caso nos hubiese

Existen, sin embargo, excepciones a la aplicación de la doctrina de academicidad: (1) cuando la decisión del tribunal no afecta a las partes litigantes, pero está presente una cuestión recurrente o repetitiva, *Asoc. de Periodistas v. González*, 127 D.P.R. 704 (1991); *El Vocero v. Junta de Planificación*, 121 D.P.R. 115 (1988) —véanse, también, a modo ilustrativo: *Lewis v. Continental Bank*, 110 S.Ct. 1249 (1990); *Honig v. Doe*, 484 U.S. 305 (1988); *Roe v. Wade*, 410 U.S. 113 (1973)— (2) cuando la propia parte demandada termina voluntariamente su conducta ilegal, *Com. de la Mujer v. Srio. de Justicia*, supra —véanse, a modo ilustrativo: *Teachers v. Hudson*, 475 U.S. 292, 305 (1986); *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982)— y (3) cuando la situación de hechos fue cambiada voluntariamente por el demandado, pero no tiene visos de permanencia (véanse, a modo ilustrativo: *Gwaltney v. Chesapeake Bay Foundation*, 484 U.S. 49, 66 (1987); *United States v. W.T. Grant Co.*, 345 U.S. 629 (1953)).

De igual manera se plantea una excepción a esta doctrina cuando, en conformidad con la Regla 20 de Procedimiento Civil, 32 L.P.R.A. Ap. III, el tribunal ha certificado una clase y la controversia se torna académica para uno de los miembros, pero no para el representante de la clase. Véanse, a modo ilustrativo: *Sosna v. Iowa*, 419 U.S. 393 (1975); *Franks v. Bowman Transportation Co.*, 424 U.S. 747 (1976). También se extiende a los casos que aparentan ser académicos pero en realidad no lo son por sus consecuencias colaterales. *El Vocero v. Junta de Planificación*, supra; *Noriega v. Gobernador*, 122 D.P.R. 650 (1988); R. Serrano Geyls, *Derecho constitucional de Estados Unidos y Puerto Rico*, San Juan, Inst. Educación Práctica, 1986, Vol. I, págs. 122–126; L.H. Tribe, *American Constitutional Law*,

---

permitido ratificar expresamente los pronunciamientos allí hechos. Véanse: *El Vocero v. Junta de Planificación*, 121 D.P.R. 115 (1988); *Hosp. San Pablo v. Hosp. Hnos. Meléndez*, 123 D.P.R. 720 (1989); *Asoc. de Periodistas v. González*, 127 D.P.R. 704 (1991).

2da ed., Nueva York, the Foundation Press, 1988, Sec. 3-11, págs. 84 y 91–92.

En el caso de autos, el conflicto entre los sonidos intolerablemente altos de las ceremonias religiosas y el derecho a la intimidad y tranquilidad de los vecinos es una controversia recurrente en otras comunidades; por estar sujeta a evadir su adjudicación, requiere un pronunciamiento de este Tribunal. *El Vocero v. Junta de Planificación*, supra; *Hosp. San Pablo v. Hosp. Hnos. Meléndez*, 123 D.P.R. 720 (1989); *Asoc. de Periodistas v. González*, supra. Tan recurrente es esta controversia que para la fecha en que se dictó la sentencia había aproximadamente tres mil 3,000 querellas pendientes. Además, ejemplo patente de la evasión de revisión judicial es el presente caso donde, por la lentitud e ineficacia de los procedimientos de la Junta de Calidad Ambiental para controlar los sonidos intolerablemente altos que afectaron al demandante, éste se vio obligado a mudarse a otro lugar antes de que este Tribunal pudiera pasar juicio sobre la constitucionalidad de la citada Ley Núm. 22. Véase *Com. de la Mujer v. Srio. de Justicia*, supra, págs. 725–727.

Por otro lado, el Art. 277 del Código de Enjuiciamiento Civil de 1933, *supra*, provee *dos (2) remedios distintos* contra las perturbaciones o estorbos que afecten "el cómodo goce de la vida o de los bienes". Estos son: que "cese aquella [perturbación], así como decretar el resarcimiento de los perjuicios". 32 L.P.R.A. sec. 2761.

Por eso hemos resuelto que la causa de acción bajo este precepto tiene un propósito dual, y al aplicar el Art. 277, *supra*, "hay *dos fines que cumplir: (1) reducir la perturbación hasta el punto que sea compatible con el cómodo disfrute de la propiedad y (2) compensar los daños ocasionados hasta el momento del juicio*". (Énfasis suplido.) *Casiano Sales v. Lozada Torres*, 91 D.P.R. 488, 499 (1964). Véanse, también: *Ortega Cabrera v. Tribunal Superior*,

101 D.P.R. 612, 617 (1973); *Torres v. Rodríguez*, 101 D.P.R. 177, 181 (1973).

Por la naturaleza independiente de estos remedios, no es necesario que proceda o subsista uno como requisito previo para otorgar el otro. Así, no hay que esperar a que exista un perjuicio o daño para tener derecho al remedio de *injunction*. *Carreras v. Municipio*, 56 D.P.R. 95, 97 (1940). De igual manera, se retiene el derecho a recobrar daños por las perturbaciones sufridas a pesar de que la persona afectada se haya visto obligada a mudarse a otro lugar para mitigar su daño, o haya cesado la perturbación.

En *Ríos v. Municipio de San Sebastián*, 106 D.P.R. 172 (1977), dejamos sin efecto un *injunction* concedido contra el Municipio por haber cesado el estorbo que constituía un vertedero público. Además, en *Arcelay v. Sánchez*, 77 D.P.R. 824, 848 (1955), la demandante, "por causa de la perturbación mantenida por el demandado ... se fue de la casa trasladándose a otra de su propiedad", donde residía al momento del juicio. Sin embargo, en ambos casos dejamos en vigor la concesión de daños anteriormente sufridos como consecuencia de los estorbos.

Resultaría indefendible la práctica de obligar a un demandante a soportar, a través de todo el proceso judicial, los perjuicios a su salud, molestias, angustias o trastornos causados por el demandado como requisito previo a reconocerle su derecho a una compensación por el perjuicio ocasionado por el estorbo.[2]

---

[2] Debe advertirse que nuestro Art. 277 del Código de Enjuiciamiento Civil de 1933 (32 L.P.R.A. sec. 2761) proviene del Código Civil de California, que dispone:

"Anything which is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the confortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance." Cal. Civil Code Sec. 3479 (West 1954).

*Este remedio se distingue del de daños y perjuicios por negligencia en cuanto, bajo esta disposición, no hay que probar la existencia de culpa o negligencia por parte del perturbador.* La responsabilidad es absoluta una vez se determina que existe el

A raíz de nuestra determinación en *Sucn. de Victoria v. Iglesia Pentecostal,* supra, pág. 29, al efecto de que el Art. 277, Ley Contra Perturbaciones o Estorbos, *supra, es "el remedio adecuado* para reivindicar los derechos" de los demandantes en este tipo de casos, la Asamblea Legislativa expresamente negó a nuestros ciudadanos el derecho tanto a un *injunction* como a la reparación de daños cuando es el culto en una iglesia el que constituye un estorbo: "[L]o aquí provisto no podrá aplicarse a las actividades relacionadas con el culto público practicado por las diferentes religiones." Art. 277, *supra.*

En el caso de autos, el tribunal de instancia resolvió que dicha exclusión era inconstitucional y concedió los dos (2) remedios que provee el citado Art. 277 contra todo estorbo: el *injunction* y los daños. Una vez dictada la sentencia, otros hechos obligaron a dejar sin efecto únicamente el *injunction* expedido. Sin embargo, prevaleció el decreto de inconstitucionalidad y la determinación de daños causados por los estorbos públicos. Por lo tanto, el hecho de que el *injunction* a nivel de desacato se tornara académico, no necesariamente implica que la totalidad del recurso deba sufrir ese mismo destino. En la medida en que aún hay que determinar si proceden los daños bajo el Art. 277, *supra,* los cuales fueron sufridos independientemente de que los demandantes hayan vendido su residencia, es necesario expresarnos sobre la validez de la Ley Núm. 22, *supra,* que autoriza a recobrar dichos daños contra todo perturbador, excepto contra las iglesias.

Resolver lo contrario implicaría que un litigante afectado por un estorbo o perturbación no podría recobrar daños bajo esta ley, a pesar de haberlos sufrido, a menos que solicite, le sea concedido y subsista el *injunction.* Esto es

---

estorbo. 36 California Jurisprudence 2d, Sec. 61, pág. 539. De aquí que las doctrinas de estorbo y negligencia sean separadas y distintas y requieran prueba distinta. *Torts: Distinction Between Negligence and Nuisance,* 6 Cal. L. Rev. 228, 229 (1917–18).

contrario a las disposiciones del citado Art. 277, que expresamente provee dos (2) remedios distintos contra los estorbos públicos.

Ante nos los apelantes cuestionan los daños concedidos y sostienen que el estatuto impedía que las iglesias tuvieran que reparar cualquier perjuicio causado por perturbar la tranquilidad de sus vecinos. Examinado el ordenamiento estatutario y los remedios duales establecidos por el citado Art. 277, solamente si se sostiene el decreto de inconstitucionalidad de la Ley Núm. 22, *supra*, es que se le pueden conceder daños a la familia Lasso de la Vega por los agravios sufridos. En estas circunstancias, un pronunciamiento de esta Curia definitivamente ha de tener " 'efectos prácticos sobre una controversia existente' ". (Énfasis suprimido.) *El Vocero v. Junta de Planificación*, supra, pág. 123. Véase *E.L.A. v. Aguayo*, 80 D.P.R. 552, 584 (1958).

Por lo tanto, en la situación factual del caso de autos, existe una controversia justiciable entre las partes y este Tribunal tiene el deber ineludible de examinar la validez del estatuto que excluye a las iglesias del alcance del citado Art. 277. Para esta familia la controversia nunca ha dejado de ser justiciable precisamente porque los sonidos de la iglesia no sólo les causaron daños emocionales de carácter permanente, sino que también tuvieron que dejar su hogar en busca de un lugar donde pudiesen disfrutar de la paz y tranquilidad que no tuvieron cerca de la iglesia.(3) Cometeríamos una gran injusticia con esta familia si, después de esperar tanto tiempo por un remedio judicial, ahora invocásemos una norma de autolimitación para evitar hacer pronunciamientos sobre una controversia viva y real entre las partes.

---

(3) "En su esencia, este caso trata de uno de los valores más preciados de la vida civilizada: la vivienda, que sin ser fastuosa, sea tranquila, serena y agradable; el hogar en el cual el ser humano busca tranquilidad espiritual y física luego de un día gastado en la lucha económica de la sociedad industrial contemporánea." *Torres v. Rodríguez*, 101 D.P.R. 177, 178 (1973).

Por las razones que anteceden, concluimos que el caso de autos no es académico. Decidir lo contrario equivaldría a abdicar a nuestra responsabilidad constitucional de adjudicar la controversia de gran importancia para el país que se presenta en este recurso.

### III

Por otro lado, los demandados apelantes sostienen que debido a la inexistencia de una controversia real y efectiva en el caso de autos, los demandantes carecen de legitimación activa para impugnar la ley, tanto en su carácter individual como en virtud del derecho de terceros. *Zachry International v. Tribunal Superior*, 104 D.P.R. 267 (1975).

La doctrina de legitimación activa requiere que la persona en cuestión tenga un interés legítimo afectado. En *Col. Ópticos de P.R. v. Vani Visual Center*, 124 D.P.R. 559 (1989), señalamos que la legitimación activa requiere capacidad para demandar e interés legítimo en la causa de acción. Ese interés se manifiesta en el reclamo de daños palpables a los derechos constitucionales. Por otro lado, el daño debe ser de tal índole que con toda probabilidad pueda proseguir vigorosamente su causa de acción. *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407 (1982). Existe una nueva visión flexible y liberal en la interpretación de los requisitos de legitimación activa. Su propósito es darle protección a las partes que acuden ante nos solicitando la vindicación de sus derechos. *Col. Ópticos de P.R. v. Vani Visual Center*, supra.

En el caso de autos es evidente el interés individual afectado. Los demandantes alegaron y probaron el sufrimiento de graves angustias mentales, consecuencia directa del intolerable nivel de sonidos provenientes de las actividades religiosas en la Iglesia. Ante este cuadro factual, Lasso de la Vega tenía legitimación activa para impugnar la constitucionalidad de la Ley Núm. 22, *supra*.

Con respecto a la Ley Núm. 21,(⁴) *supra*, y a la Sec. 1 de la Ley Núm. 71,(⁵) *supra*, la situación es distinta, ya que estas leyes son de naturaleza penal. En estatutos criminales, la persona agraviada por una conducta no tipificada como delito no tiene, de ordinario, legitimación activa para impugnarlos. Como consecuencia, se equivocó el tribunal sobre este particular y coincidimos con la sentencia de este Tribunal que revoca el decreto de inconstitucionalidad de la legislación penal incluida en la Ley Núm. 21, *supra*, y en la Sec. 1 de la Ley Núm. 71, *supra*.

## IV

Los apelantes cuestionan la declaración de inconstitucionalidad de la Ley Núm. 22, *supra*. Este estatuto enmendó el Art. 277 del Código de Enjuiciamiento Civil, *supra*, a los fines de excluir a las instituciones religiosas de la acción interdictal por perturbación o estorbo:

> Todo lo que fuere perjudicial a la salud, indecente u ofensivo a los sentidos, o que interrumpa el libre uso de la propiedad, de modo que impida el cómodo goce de la vida o de los bienes, constituye una perturbación que da lugar a una acción. Dicha acción podrá ser promovida por cualquier persona cuyos bienes hubieren sido perjudicados o cuyo bienestar personal resulte

---

(⁴) "Quedan exentos del cumplimiento de las secs. 1443 a 1448 de este título los conductores de ambulancias y carros de bombas de incendio mientras estuvieren prestando el servicio apropiado a la naturaleza de dichos vehículos. *No se entenderá que es ruido innecesario el producido por las campañas de las iglesias en el ejercicio de sus funciones y cultos religiosos, así como tampoco el que puedan generar los cultos o ritos de las iglesias, sectas o denominaciones religiosas debidamente establecidas; Disponiéndose que nada de lo aquí dispuesto limitará los poderes de la Junta de Calidad Ambiental para promulgar los reglamentos a que está autorizada por ley.* (Énfasis suplido.) 33 L.P.R.A. sec. 1447.

(⁵) "Por la presente se prohíben los ruidos innecesarios de todas clases provenientes del uso del claxon o aparato de alarma en la zona urbana, radios en casas de comercio, cafés y otros sitios públicos, altoparlantes que circulen por las calles con fines comerciales, campanas del tranvía eléctrico, pitos del tren en la zona urbana, bocinas y sirenas de bicicletas, y cualesquiera otros también innecesarios que se produzcan por medio de cualquier otro aparato, utensilio o instrumento, no importa su nombre, naturaleza o denominación." 33 L.P.R.A. sec. 1443.

menoscabado por dicha perturbación; y la sentencia podrá ordenar que cese aquélla, así como decretar el resarcimiento de los perjuicios; *lo aquí provisto no podrá aplicarse a las actividades relacionadas con el culto público practicado por las diferentes religiones; Disponiéndose, que nada de lo aquí dispuesto limitará los poderes de la Junta de Calidad Ambiental para promulgar los reglamentos a que está autorizada por ley.* (Énfasis suplido.)

En apoyo de su posición argumentan que este precepto establece un delicado balance entre los derechos constitucionales en conflicto y remite estas controversias a la Junta de Calidad Ambiental "para garantizar que su adjudicación se haga de la manera menos onerosa para ambos intereses en juego". Informe del Procurador General, pág. 9.

Hemos sostenido que no procede invocar las doctrinas de jurisdicción primaria y agotamiento de remedios administrativos para detener un *injunction* cuando éste se emite para corregir un agravio de patente intensidad a un derecho constitucional que reclama reparación inmediata y que elude el cauce administrativo. *Noriega v. Gobernador*, supra; *García Cabán v. U.P.R.*, 120 D.P.R. 165 (1987); *Pierson Muller I v. Feijoó*, 106 D.P.R. 838 (1978); *Febres v. Feijoó*, 106 D.P.R. 676 (1978). En el caso de autos, las ceremonias de la iglesia causaron un daño material y sustancial al derecho de intimidad de la familia Lasso de la Vega y se demostró que el recurso administrativo era una gestión inútil e inefectiva que no ofrecía un remedio adecuado para impedir la repetición de las prácticas. *Rivera v. E.L.A.*, 121 D.P.R. 582 (1988).

De lo contrario, privaríamos a un ciudadano de utilizar la acción interdictal contra sonidos intolerablemente altos para rápidamente vindicar los derechos reconocidos en *Sucn. de Victoria v. Iglesia Pentecostal*, supra.

Demostrada nuestra jurisdicción, examinemos la constitucionalidad de la Ley Núm. 22, *supra*.

## V

Un estudio histórico revela que tanto la Ley Núm. 21, *supra*, como la Ley Núm. 22, *supra*, se promulgaron después de las protestas públicas de grupos religiosos a raíz de nuestra decisión de *Sucn. de Victoria v. Iglesia Pentecostal*, supra. En aquella ocasión, luego de un cuidadoso balance de los valores en conflicto, deslindamos el alcance entre el derecho a la intimidad y el derecho a la libertad de culto, y resolvimos que la Ley contra Perturbaciones y Estorbos, Ley Núm. 22, *supra*, era el remedio adecuado para vindicar el derecho de toda persona a tener tranquilidad en su hogar para compartir sus horas libres con su familia y para tener un ambiente que le permita leer, meditar, escuchar música y ver televisión sin interferencias externas.

Hoy nos corresponde resolver si la Ley Núm. 22, *supra*, promulgada por la Asamblea Legislativa después de *Sucn. de Victoria v. Iglesia Pentecostal*, supra, viola la cláusula contra el establecimiento de una religión consagrada en la Sec. 3 del Art. II de la Constitución del Estado Libre Asociado:

> *No se aprobará ley alguna relativa al establecimiento de cualquier religión* ni se prohibirá el libre ejercicio del culto religioso. Habrá completa separación de la iglesia y el estado. (Énfasis suplido.) L.P.R.A., Tomo 1, ed. 1982, pág. 262.

Recientemente, en *Díaz v. Colegio Nuestra Sra. del Pilar*, 123 D.P.R. 765 (1989), expusimos el alcance y la base histórica de la Sec. 3 del Art. II, *supra*, y expresamos que las cláusulas de libertad de culto y de establecimiento de religión están continuamente en tensión o conflicto. También afirmamos que "[a]unque la libertad de credo es absoluta, la autonomía para actuar conforme a dichas creencias tiene sus limitaciones". *Íd.*, pág. 778. Véase R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, 2da ed., San Juan, Inst. Educación Práctica, 1988,

Vol. II, pág. 1711. Véanse, además: L. Rivera Rivera, *Iglesia y Estado en Puerto Rico,* 56 Rev. Jur. U.P.R. 97 (1987); *Rotunda, Nowak y Young, Treatise on Constitutional Law: Substance and Procedure* Sec. 21.1, págs. 340–341.

Para resolver el antagonismo natural entre la libertad de culto y la prohibición del establecimiento de religiones, el mejor criterio es el concepto de neutralidad de la acción concernida. *Rotunda, Nowak y Young,* supra, Sec. 21.3.; *Díaz v. Colegio Nuestra Sra. del Pilar*, supra. Al amparo de esta normativa, una exención fundada en la naturaleza religiosa de un acto, que no coloca a las organizaciones religiosas en el mismo plano que las demás, viola la cláusula contra el establecimiento de una religión. No olvidemos que en una sociedad pluralista el Estado tiene que ser neutral tanto con los feligreses como con los no creyentes. Corresponde a los ciudadanos y no al Estado la promoción y defensa de sus respectivos credos. Tribe, *op. cit.*, Sec. 14-3, pág. 1160.

La base filosófica de esta normativa fue expuesta en *Everson v. Board of Education*, 330 U.S. 1, 15–16 (1947):

La cláusula de "establecimiento de una religión" en la Enmienda Primera significa cuando menos esto: Ni un estado ni el gobierno federal pueden erigir una iglesia. *No puede ninguno de los dos aprobar leyes que ayuden a una religión, que ayuden a todas las religiones, o que prefieran una religión a otra.* Ninguno de los dos puede obligar o influir sobre una persona para que vaya a una iglesia, o para que quede fuera de ésta, contra su voluntad, ni pueden obligarlo a creer o a no creer en una religión. Ninguna persona puede ser castigada por sostener o profesar creencias religiosas, o por no profesarlas; por asistir a la iglesia o por no asistir. No se puede imponer tributo, grande o pequeño, para sostener actividades o invitaciones religiosas, no importa como se denominen, ni la forma que adopten para enseñar o practicar la religión. Ni un estado ni el gobierno federal pueden, abierta o secretamente, participar en los asuntos de ninguna organización o grupo religioso, y viceversa. (Énfasis y traducción nuestros.)

Esta doctrina requiere que una acción estatal, que esté

en conflicto con la cláusula de establecimiento de religión, tenga que superar tres (3) principios rectores: (a) que posea un propósito secular; (b) que su efecto no sea promover o inhibir la religión, y (c) que no conlleve una intervención excesiva en los asuntos religiosos. *Díaz v. Colegio Nuestra Sra. del Pilar*, supra. Véanse también, a modo *ilustrativo: Lemon v. Kurtzman*, 403 U.S. 602 (1971); *Wallace v. Jaffree*, 472 U.S. 38 (1985); *Meek v. Pittenger*, 421 U.S. 349 (1975); *Committee for Public Education v. Regan*, 444 U.S. 646 (1980); *Everson v. Board of Education*, supra; *Rotunda, Nowak y Young*, supra, Sec. 21.3, págs. 344–345.

Para determinar si un estatuto contiene un propósito religioso, se examina, en primer lugar, su historial legislativo, particularmente las expresiones de los legisladores que intervinieron en la confección de la medida. En buena hermenéutica jurídica, tales expresiones, en unión a los informes de las comisiones e historiales legislativos, constituyen las herramientas necesarias para determinar su finalidad. Véase R.E. Bernier y J.A. Cuevas Segarra, *Aprobación e interpretación de las leyes de Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1987, págs. 245–247 y 371–378.

A lo largo del extenso debate en el hemiciclo del Senado y de la Cámara de Representantes siempre resaltó el fin religioso del referido estatuto. Por ejemplo, en la sección expositiva de los propósitos del P. del S. 784 sobre la enmienda al mencionado Art. 277 se expuso:

> ... es deseable que haya un equilibrio saludable entre los intereses de los ciudadanos a disfrutar su intimidad *y la necesidad de que haya templos de religión en todos los sectores, accesibles al pueblo, para adorar a Dios.* (Énfasis suplido.)

En el debate legislativo, senadores y representantes de todos los partidos expusieron el objetivo religioso de la medida. Entre otros, el representante Morales Rodríguez recordó la reacción adversa de los sectores religiosos a *Sucn. de Victoria v. Iglesia Pentecostal*, supra, y destacó

que correspondía a la Asamblea Legislativa ayudar a la Iglesia Pentecostal.

Las objeciones, principalmente de la Iglesia de Dios Pentecostal a las que se unió el Concilio Evangélico y la Iglesia Católica también, y que produjeron aquella enorme manifestación de aquel miércoles, a la cual nosotros tuvimos el privilegio y el honor de unirnos y caminar desde el Parque Muñoz Rivera hasta frente a este Capitolio.

Evidentemente, señor Presidente y compañeros de Cámara, era una evidencia clara de que algo se ponía en peligro. Lo hicieron bien los que marcharon y los que protestaron. Porque podía darse el caso de que un buen día en una de las calles de nuestras poblaciones se reuniera un grupo, especialmente de Pentecostales, a adorar allí a Dios en la forma en que ellos quieren adorarlo y apareciera un señor policía a decirles que tenían que bajar el volumen de los altoparlantes o que tenían que dejarlos de usar; amparados en una decisión reciente del Tribunal Supremo de Puerto Rico.

Ese era el riesgo, la amenaza y había que hacer algo. Por eso aquella marcha frente al Capitolio, y entonces vienen [sic] a donde tenían que venir, ¿A dónde era que iban a ir? No era al Tribunal Supremo, ni a ningún otro sitio. Tenían que venir a la casa del pueblo, a la Asamblea Legislativa a exponerle su caso. Y aquí se le escuchó, con vehemencia, con respeto, como ellos se portan, como ellos actúan. Y los vimos en la marcha y el honorable Gobernador de Puerto Rico también los recibe porque las leyes se aprueban aquí, pero el Gobernador es quien las firma o no las firma.

Expuso, además:

Porque si alguna gente hace bien en Puerto Rico, son los pentecostales y son los menos que sacrifican al gobierno, a cualquier gobierno. 28 Diario de Sesiones de la Asamblea Legislativa 6–7 (1974).

Por su parte, la Senadora Ruth Fernández, entre otras cosas, señaló:

Señor Presidente y compañeros del Senado: Yo soy Católica, Apostólica, Romana y Cursillista, pero sobre todas las cosas soy cristiana. Todas las religiones que conducen a Dios las respeto y las admiro. Verdaderamente me dio una pena inmensa cuando

las personas que decretaron que alabar el nombre de Dios en voz alta, es un ruido innecesario. *Realmente nos estamos alejando tanto de Dios que yo creo que haría falta todavía hablar más duro para que se enterara el mundo entero a ver si nos acercamos un poquito más a El.*

*Por esta razón y conociendo el respeto que siempre las religiosas han tenido por la sociedad puertorriqueña y el mundo, y la falta que hace la religión, para que este mundo sea un mundo mejor, votaré a favor de estos proyectos*, porque no puede ni debe limitarse la forma en que usted quiere alabar a Dios, siempre y cuando por supuesto se respete el derecho a los demás. Pero vuelvo e insisto que la iglesia, de todas las denominaciones, siempre han [sic] tenido respeto por su comunidad. (Énfasis suplido.) 28 Diario de Sesiones de la Asamblea Legislativa (Senado), Núm. 50, pág. 606 (1974).

El Senador Hernández González, tras unirse a las expresiones de la senadora Ruth Fernández, consignó:

Yo lamento distinguidos compañeros que yo me apasione y que exprese de una manera apasionada los puntos de vista que tengo sobre este aspecto. Pero es que yo les digo con honestidad que esto me toca en mi carne y en mis huesos, porque yo hace treinta y siete años lo que tengo en vida, que soy Protestante. *Y es por esa razón que quiero que no para el beneficio de los Protestantes, sino para el beneficio de todas las actividades religiosas en Puerto Rico que en este Senado se deje claro y diáfanamente establecido que no hay autoridad alguna bajo nuestro sistema constitucional para reglamentar el ejercicio, la práctica y la forma de oración de las diferentes religiones.* (Énfasis suplido.) Diario de Sesiones, *supra*, pág. 606.

Más adelante expresó el Senador Gilberto Rivera Ortiz:

Conozco la labor que realiza la iglesia de Dios Pentecostal y ciertamente es extraordinaria y de gran impacto en la vida de muchas familias puertorriqueñas. Miles de personas han experimentado cambios maravillosos en sus vidas que les ha guiado hacia un derrotero en que se logra un mayor disfrute de la vida y así, igualmente los movimientos cursillistas y las misiones parroquiales y los movimientos de evangelización y avivamiento espiritual. *En la actualidad todas las religiones están dando énfasis al avivamiento de su fe y esto necesariamente se tiene que reflejar en sus ritos. ¡Ojalá y pudiéramos cultivar más*

*de ésto, pues bastante falta nos hace a todos en nuestro país!* (Énfasis suplido). Diario de Sesiones, *supra,* pág. 611.

En el mismo sentido se expresó el Senador Miguel Hernández Agosto:

Y una sociedad como la nuestra tiene, respetando la separación del Estado y de la Iglesia, señor Presidente y compañeros del Senado que utilizar todas las armas, todos los vehículos a su disposición para que nuestra ciudadanía *pueda cada día tener más apego a Dios y para que pueda estar más en comunión con Dios.* (Énfasis suplido.) Diario de Sesiones, *supra,* pág. 612.

El Senador Palerm Alfonzo destacó el propósito religioso de la propuesta legislación cuando afirmó:

Sus criterios legales han sido fantásticos y sobre todo la forma cómo en esta noche han hecho alabanzas al Señor. Si siempre fuera esto así sería un modelo, un modelo de cristianos en comunión con el Creador. Yo los felicito a toditos y ojalá hubiera siempre unos proyectos de esta naturaleza, porque amigo Marcano, la *política nos separa; la religión nos une. Y aquí esta noche no hay fariseos, todos somos creyentes en un Señor y todos estamos en favor de que cada uno que haya nacido en este pueblo adore a Dios como mejor crea conveniente. Amén.* (Énfasis suplido.) Diario de Sesiones, *supra,* pág. 613.

Podríamos citar *ad infinitum* otras expresiones de los legisladores que aprobaron las enmiendas. Sin embargo, creemos que bastaría señalar como última muestra del verdadero propósito legislativo las expresiones del Senador Izquierdo Mora:

Termino mis palabras, señor Presidente, manifestando que, ¡ojalá que en cada esquina en Puerto Rico en vez de haber una vellonera, en vez de haber una barra, en vez de haber un prostíbulo, ojalá que en cada esquina en este país hubiera una Iglesia de Dios Pentecostal o una Iglesia Católica, o de cualquier secta Protestante! Ese día y a pesar de que todos gritaran a pulmón lleno para adorar a Dios, ese día, señor Presidente y compañeros Senadores, habría más decencia, más moral y más vergüenza en el Pueblo de Puerto Rico. Diario de Sesiones, *supra,* pág. 614.

De manera similar, miembros de los tres (3) partidos representados en la Legislatura respaldaron la medida. No podemos refrendar la aprobación de la religión por el estado a cambio del apoyo político. Tribe, *op. cit.*, Secs. 14 y 15, pág. 1287.

A la luz de esas expresiones, es forzoso e inevitable concluir que la medida tiene una *finalidad* eminentemente religiosa y no secular, como requiere nuestra Constitución. Por lo tanto, confirmaríamos el decreto de inconstitucionalidad de la Ley Núm. 22, *supra*.

## VI

Por otro lado, la reglamentación aprobada por el Estado al amparo de la Ley de Calidad Ambiental tampoco corrige el problema constitucional ni modifica su finalidad religiosa. Todo lo contrario, el reglamento también ha sido redactado con un propósito religioso que impide su aplicación efectiva sin distinción de personas u organismos. También en la praxis tiene el efecto de promover una religión.

En conformidad con la Ley Núm. 22, *supra*, la Junta de Calidad Ambiental es el foro apropiado para regular la emisión de sonidos intolerablemente altos provenientes de los templos, iglesias e instituciones religiosas. A esos fines promulgó el Reglamento para el Control de la Contaminación por Ruidos (versión enmendada de 25 de febrero de 1987), que establece los niveles de emisión de sonido permitidos en distintas zonas. Este Reglamento provee un procedimiento administrativo para investigar y atender querellas por sonidos intolerablemente altos y establece unos niveles de tolerancia permitidos en las zonas restringidas.

Sin embargo, a modo de excepción, el Art. 4.6 del mencionado Reglamento establece un organismo compuesto por líderes religiosos para asesorar en la formulación de las reglas aplicables a las iglesias y con derecho a interve-

nir en los procedimientos adjudicativos de las querellas por ruidos innecesarios generados en las ceremonias. Su texto dispone:

> Se crea el Consejo Asesor sobre Asuntos Religiosos para *asesorar a la Junta* de Calidad Ambiental en el establecimiento de la política pública ambiental que de alguna manera incida en el derecho constitucional de libre culto que les asiste a las instituciones religiosas reconocidas en Puerto Rico. *Este Consejo Asesor será nombrado por la Junta de Calidad Ambiental y el mismo estará compuesto por líderes de organizaciones religiosas debidamente establecidas en Puerto Rico.* Dicho Consejo Asesor establecerá su organización interna.
>
> El Consejo Asesor sobre asuntos religiosos *tendrá derecho a intervenir cuando se suscite alguna controversia en la cual esté envuelta cualquier querella de ruidos generados por instituciones religiosas y podrá asesorar a las mismas sobre las medidas de control y prevención necesarias.*
>
> Toda controversia en la cual sea parte una institución religiosa será sometida a la consideración de un Panel Examinador designado por la Junta de Calidad Ambiental. (Énfasis suplido.) Informe del Procurador General, Anejo 1, págs. 17–18.

Este artículo, además, constituye un buen ejemplo de una excesiva vinculación administrativa entre el Gobierno y los grupos religiosos. En primer lugar, el Consejo está compuesto únicamente por líderes religiosos, quienes tienen la responsabilidad de elaborar los criterios aplicables a los sonidos excesivamente altos que provienen de las iglesias. Por su naturaleza, el Comité requiere contacto frecuente entre los líderes religiosos y el personal de la Junta de Calidad Ambiental para resolver diferentes asuntos vinculados con las prácticas de las iglesias afectadas, que incluyen desde el horario de las ceremonias hasta los instrumentos musicales permitidos. Esto conlleva un envolvimiento excesivo del Estado con las agrupaciones religiosas.

El reglamento dispone que el Estado seleccionará los miembros del Consejo que representará a las organizaciones religiosas *"debidamente establecidas en Puerto Rico"*

(énfasis suplido), y delegará en sus líderes el poder de asesorar a otras entidades sobre las "medidas de control" que deben poner en vigor *para cumplir con la ley*. Para nombrar a los miembros del Consejo, el Estado tiene que primero determinar cuáles son las "iglesias debidamente establecidas". Al tomar esa decisión, tiene que emitir un juicio sobre lo que es una iglesia "debidamente establecida", y entonces seleccionar un representante de cada una. Esto de su faz es inconstitucional.

También se faculta al Consejo a intervenir tanto en la investigación como en la adjudicación de querellas contra las iglesias. Cuando se suscite una querella el Consejo, éste puede simultáneamente asesorar no sólo a la Junta sino también a las iglesias sobre las medidas de control de sonidos. También tiene derecho a comparecer como interventor en el procedimiento adjudicativo.

En sus múltiples y conflictivas funciones, los líderes religiosos actúan como representantes del Estado, y al evaluar los sonidos provenientes de las iglesias, tendrán que emitir juicios sobre los métodos utilizados por otras iglesias al ejercer su libertad de culto. Por imperativo de la cláusula de religión de nuestra Constitución, esta actuación constituye una intromisión del Gobierno en los asuntos religiosos. *Díaz v. Colegio Nuestra Sra. del Pilar*, supra. Resulta, además, en una impermisible delegación de poderes gubernamentales a representantes de organizaciones privadas de carácter sectario. Véase *Larkin v. Gradel's Den, Inc.*, 459 U.S. 116 (1985).

En el caso de autos, esta reglamentación particular de las iglesias resultó ineficaz e inoperante. Según quedó demostrado con el testimonio de Héctor Valencia, inspector del Área de Control de Ruido de la Junta de Calidad Ambiental, solamente había un inspector para investigar más de tres mil ($3,000) querellas y éste no tenía el equipo ne-

cesario para desempeñar eficazmente sus funciones.(⁶) A preguntas del juez, el inspector también expresó que la mayoría de las querellas de contaminación por ruidos provenían de las iglesias y que el procedimiento utilizado para adjudicar las quejas era inoperante. T.E., pág. 101. Estas afirmaciones fueron corroboradas por el Lic. Pedro Antonio Maldonado Ojeda, Director de la Oficina de Servicios Legales de la Junta de Calidad Ambiental, quien expuso que tomaba un promedio de *doscientos cincuenta y seis (256) días* poner en vigor las órdenes de cese y desista contra los infractores. T.E., pág. 128.

Si se le confiere a la Junta de Calidad Ambiental la facultad de regular los sonidos emitidos por las instituciones religiosas, excluyéndolas de esa forma de los remedios interdictales, y el procedimiento administrativo resulta ser inoperante en su praxis, estamos ante una situación en la cual el ciudadano común está en estado de indefensión para vindicar su derecho a la intimidad. *El resultado neto*

---

(⁶) La incapacidad de la agencia para atender las miles de querellas fue aceptada por la Junta de Calidad Ambiental en el interrogatorio de su único inspector:

"R. Porque nosotros hacemos la visita, vamos al lugar, medimos si la fuente está en operación y, y de ahí tenemos que proseguir a otra querella que no nos podemos quedar todo el culto desde que empieza a que termina para hacer la medición, sino que tenemos que informar lo que encontramos al momento de esa visita.

"HON. JUEZ:

"P. Y eh ... y eso que dijo el testigo, de que ustedes van en un vehículo rotulado, ¿es cierto?

"R. Sí, es correcto.

"P. O sea, que si la, [sic] el, la fuente emisora llega a identificar lo que está pasando, puede alterar, como dice el testigo.

"R. En, en caso de, de este tipo de fuentes, lo pueden hacer.

"ABOGADO DEL DEMANDANTE:

"P. ¿Ha ocurrido con usted?

"R. ¿Perdóneme?

"P. ¿Le ha ocurrido con usted esta, esta situación?

"R. ¿Esta situación? Bueno, yo he llegado en ... en referente a estos mismos casos, yo he llegado en ocasiones en casos que hay veces han cerrado todas las ventanas y se han ido cuando se dan cuenta que hay un inspector. En otros casos no lo han hecho; o hacen más ruido o hacen menos ruido. Todo varía de, de acuerdo a la actitud de la persona frente al problema.

"HON. JUEZ:

"P. Pero, se ha dado casos, entonces.

"R. Se han dado casos. " T.E., págs. 92–93.

*de esta situación es que esas iglesias de facto son intocables.*
La consecuencia de esta ausencia de un remedio efectivo es
la promoción religiosa. Ello constituye un envolvimiento
excesivo con una religión y es contrario al espíritu y a la
letra de la Constitución.

En vista del anterior análisis normativo, procedería que
este Tribunal decretara la inconstitucionalidad del citado
Art. 4.6 del Reglamento para el Control de la Contamina-
ción por Ruidos. Como los apelados impugnaron en instan-
cia y ante nos la validez de esta disposición, y esta deter-
minación implica una cuestión constitucional importante
que nos corresponde resolver como intérpretes máximos de
la Constitución, emitiríamos estos pronunciamientos sin
trámites ulteriores. Véanse, también: 4 L.P.R.A. sec. 36;
*Galarza Soto v. E.L.A.,* 109 D.P.R. 179 (1979).

En síntesis, la clara motivación religiosa de la ley en
combinación con su efecto religioso y el excesivo involucra-
miento con los grupos religiosos requerido por la reglamen-
tación vigente, hacen que el estatuto y el Art. 4.6 del Re-
glamento para el Control de la Contaminación por Ruidos
de la Junta de Calidad Ambiental, *supra,* sean
inconstitucionales. Estas disposiciones violan la cláusula
contra el establecimiento de una religión de la Sec. 3 del
Art. II de la Constitución del Estado Libre Asociado, *supra,*
e impiden que el Estado proteja adecuadamente el derecho
a la intimidad de los ciudadanos.

## VII

Resta evaluar si la determinación de daños se ajusta a
la prueba presentada. El Tribunal a quo concedió una com-
pensación de cincuenta mil dólares ($50,000) por concepto
de angustias mentales y quince mil dólares ($15,000) por
violación al derecho a la intimidad y a la propiedad.

Del examen de la prueba podemos concluir que no se
justifica la concesión de la partida de quince mil dólares

($15,000) por concepto de violación al derecho de propiedad. El récord está ausente de prueba sobre daños al derecho de propiedad. En este aspecto estamos conformes con la Parte II de la Sentencia emitida por el Tribunal.

Respecto a la cuantía de las indemnizaciones por concepto de angustias mentales, entendemos que no hay suficiente prueba en autos para justificar la suma de cincuenta mil dólares ($50,000) y, por lo tanto, la misma es exagerada. Aunque al adjudicar daños por angustias mentales somos conscientes de la importancia de la paz y tranquilidad hogareña y de los problemas que pueden causar su perturbación, nos corresponde asegurar que su resarcimiento sea razonable. La estimación de daños y perjuicios es una tarea compleja y "no está exenta de cierto grado de especulación. Aspiramos a que toda adjudicación sea razonablemente balanceada, esto es, ni extremadamente baja como tampoco desproporcionalmente alta". *Riley v. Rodríguez De Pacheco*, 119 D.P.R. 762, 805 (1987).

Por otro lado, también somos conscientes del valor comunitario y constitucional de la libertad de culto. Sin embargo, recordemos que este derecho "se ejerce por lo regular no en páramos aislados y solitarios sino en el centro mismo de nuestros pueblos y vecindarios, y su práctica no está inmune a la intervención moderadora del Estado cuando en alguna forma excede la proporción razonable de inconvenientes y molestias, inevitable concomitante de la vida en núcleos civilizados". *Sucn. de Victoria v. Iglesia Pentecostal*, supra, pág. 26.

De ordinario, las iglesias ejercen su libertad de culto sin afectar adversamente los derechos del resto de la comunidad, contribuyendo al bienestar social y espiritual de sus feligreses y de todo el país. No obstante, cuando su práctica trasciende el límite de lo que es razonable y como consecuencia de ello se perjudica el derecho a la intimidad, corresponde a los tribunales establecer un delicado equilibrio que permita que ambos se ejerzan sin intervenir indebida-

mente con el otro y reparar de una manera justa y razonable cualquier daño causado si se demuestra que sus dere-, chos han sido menoscabados. Al tomar en cuenta todos estos criterios, y a la luz de la prueba presentada, coincidimos con la Parte I de la Sentencia del Tribunal y estimamos razonable la suma de veinticincomil dólares ($25,000) para la familia Lasso de la Vega en concepto de daños por angustias mentales.[7]

Por lo antes expresado, coincidimos con las Partes I, II y III de la Sentencia emitida por el Tribunal. Sin embargo, disentimos enérgica pero respetuosamente de la Parte IV. Aunque reconocemos que el asunto es neurálgico y somos conscientes de que una adjudicación de las cuestiones constitucionales ante nos exponen a este Tribunal a intensas presiones públicas, como ocurrió cuando resolvimos *Sucn. de Victoria v. Iglesia Pentecostal*, supra, tenemos la obligación ineludible de resolver la controversia sobre la validez de la Ley Núm. 22, *supra*, que excluye a las iglesias del ordenamiento contra estorbos públicos. Desafortunadamente, hoy este Tribunal no ha cumplido cabalmente con su responsabilidad pública y se ha desaprovechado una oportunidad histórica.

---

[7] Con respecto a la concesión de honorarios de abogado, en ausencia de abuso de discreción, no intervendríamos con la determinación de temeridad hecha por el tribunal de instancia. *Corpak, Art Printing v. Ramallo Brothers*, 125 D.P.R. 724 (1990); *Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294 (1990).